Revised October 5, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 96-60761**

---

**EXXON CORPORATION, A New Jersey Corporation,**

**Plaintiff - Appellant-Cross-Appellee,**

**VERSUS**

**CROSBY-MISSISSIPPI RESOURCES, LTD., A MS Limited Partnership; LYNN CROSBY GAMMILL, General Partner; STEWART GAMMILL, III, General Partner; STEWART GAMMILL, III, as successor Trustee for Stewart Gammill IV, Trust No. 2; LUCIUS OLEN CROSBY GAMMILL, Trust No. 2; JENNIFER LYNN GAMMILL, Trust No. 2; LUCIOUS OLEN CROSBY GAMMILL; STEWART GAMMILL, IV; JENNIFER LYNN GAMMILL; STEWART GAMMILL, III, as successor Trustee for Stewart Gammill, IV,**

**Defendants - Appellees-Cross-Appellants.**

---

Appeals from the United States District Court
for the Southern District of Mississippi

---

September 2, 1998

Before POLITZ, Chief Judge, HIGGINBOTHAM, and DᴇMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

This case requires us to interpret an oil and gas agreement

entered into by Exxon Corporation (Exxon) and Crosby-Mississippi Resources, Ltd., et al. (CMR). Both parties appeal various rulings made by the district court. For the following reasons we affirm the district court in part and vacate and remand in part.

## I. Background

In 1983, Exxon and CMR entered into a joint oil and gas Exploration Agreement to develop their respective mineral resources in an area of Mississippi. Exxon held oil and gas leases covering more than 60,000 acres in the contract area, while CMR owned approximately 20,000 mineral acres in the contract area. Both Exxon and CMR contributed what they owned to the joint oil and gas exploration effort. The parties agreed that Exxon contributed 76% and CMR 24% of the oil and gas interests in the contract area.

Under the terms of the Exploration Agreement, Exxon had the exclusive right to propose the first exploratory well. CMR could choose to participate in the exploratory well up to its 24% contractual share. If CMR chose to participate, it was required to bear its proportionate share of the costs of the drilling, testing, completion, and production expenses of the well. By doing so, CMR would be entitled to 24% of the well's commercial production. If CMR chose not to participate, however, CMR could still be entitled to a "royalty" due to certain provisions which are further explained below.

A substantial number of wells were drilled by the parties. CMR participated in some but not in others. Almost from the beginning the parties were in disagreement over a number of issues. The disagreements eventually led to the filing of this action by Exxon in 1989 to collect amounts it claims are due from CMR for its share of various expenses. CMR filed a counterclaim alleging numerous claims of its own.

Because of the complexity of this case, the district court held a status conference on February 15, 1994. At the conference the court entered an order delineating nine issues for separate discovery and trial. This case is an appeal from the bench trial before the district court on the first of those issues: to what extent Exxon "earned" CMR's interest in one particular section of the contract area. Because this first issue controlled many of the later disputes between the parties, the district court certified its ruling for immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure.[1]

## The Exploration Agreement

---

[1] Rule 54 (b) provides in relevant part:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim or third-party claim, or when multiple parties are involved, the court may direct the entry of final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is not just reason for delay and upon express direction for the entry of judgment.

Under the Exploration Agreement, Exxon was to drill the first exploratory well.  CMR could choose to participate in that well up to CMR's 24% contractual interest.  If CMR chose not to participate, Exxon could "earn" CMR's 24% interest in the well so long as it was drilled in accordance with Paragraph 7 of the Exploration Agreement.  CMR, however, might still be entitled to a 1/8 "customary royalty"[2] if it owned the "actual, unleased mineral interests" in the drilling unit.[3]  Moreover, Paragraph 7 of the contract provided CMR with an additional 1/8 "overriding royalty" interest on "production allocated to the parties . . . calculated on . . . the non-consenting party's[4] contractual interest percentage."  Thus, in the simplest case -- where both parties collectively possessed 100% of the interests underlying a particular exploratory well -- CMR would receive an overriding royalty of 1/8 of 24% of the 100% joint interests of Exxon and

---

[2]  Under the majority of oil and gas leases, it is "customary" that the lessor retains a royalty interest consisting of a fraction of the gross amounts of oil or gas produced.  This customary royalty interest is often a 1/8 interest.

[3]  The Exploration Agreement defines a drilling unit as "the area fixed for the drilling of one well by order or rule of any state or federal body having authority."

[4]  The Exploration Agreement defines a consenting party as "a party who agrees to join in and pay its share of the drilling cost of any operation conducted under the provisions of this agreement." By contrast, a non-consenting party is "a party who elects not to participate in a proposed operation."  For all issues addressed in this appeal, Exxon is the consenting party and CMR is the non-consenting party.

4

CMR.[5]

If, under Paragraph 7, Exxon earned CMR's interest in an exploratory well, Paragraph 8 permitted Exxon to earn CMR's interest in any offset wells to the exploratory well, called "development wells." To earn CMR's interest in a development well, Paragraph 8 required Exxon to "commence drilling" on the development well within 180 days of the completion of the exploratory well. Each subsequent development well had to be drilled within 180 days of the completion of the previous development well. If Exxon complied with these time limits, it could earn CMR's interest in the development wells, subject to CMR's customary 1/8 royalty (if CMR owned the "actual unleased mineral interests") and the 1/8 overriding royalty on "production allocated to the parties."

Exxon timely commenced drilling on the first exploratory well, Southern Minerals No. 1. CMR chose not to participate. This well was successful and produced gas. Exxon then drilled the first development well for Southern Minerals No. 1, called Southern Minerals No. 2, and a second development well, called Crown-Zellerbach No. 24-11. Exxon ultimately drilled six more wells in the area, which are not relevant to this appeal.

At trial, CMR challenged the procedures employed by Exxon in drilling the three wells in dispute here. First, CMR claimed that

_____

[5] Paragraph 7 also gave CMR the option to covert its royalty to a working interest when the well reached payout.

Exxon failed to comply with the Exploration Agreement with regard to the drilling of Southern Minerals No. 1, thus forfeiting its rights to earn CMR's interest in the eight other development wells. The district court ruled against CMR on this issue, and CMR does not appeal this ruling. CMR does appeal the district court's rulings on three other arguments CMR made at the bench trial.

First, CMR asserts that Exxon improperly drilled the first development well, Southern Minerals No. 2, because it failed to "propose" the well to CMR in accordance with Paragraph 8. Second, it contends that Exxon did not "commence drilling" Southern Minerals No. 2 within 180 days from the "completion" of Southern Minerals No. 1, as stipulated in the contract. Third, it argues that Exxon violated the Exploration Agreement on the second development well, Crown-Zellerbach No. 24-11, because Exxon contracted with a third-party to operate the well. According to CMR, each of these failures caused Exxon to forfeit its rights to CMR's interest in the relevant wells. The district court, however, ruled against CMR on each contention, and CMR appeals these rulings.

Exxon was not completely successful in the bench trial, however. Subsequent to the signing of the Agreement, Exxon acquired "farm-ins" from various sources.[6] The trial court ruled

_____

[6] Exxon and CMR did not own all of the drilling rights throughout the Contract Area. This is not an uncommon situation in the oil and gas business. The parties desiring to drill may acquire the outstanding interests by leasing them from the third

6

that the contract unambiguously required Exxon to pay CMR the 1/8 overriding royalty on gas production occurring on the farm-ins that Exxon acquired after the inception of the Exploratory Agreement. Exxon appeals this ruling.

## II. Analysis

A district court's interpretation of a contract is a matter of law which we review de novo. *American Totalisator Co. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir. 1993). Accordingly, we review the record independently and under the same standards that guided the district court. *Id*.

Because this suit is founded on diversity jurisdiction, the district court appropriately turned to Mississippi law for the applicable standard of contract interpretation. *See **Erie R.R. Co. v. Tompkins**,* 304 U.S. 62 (1938). Under Mississippi law, "[w]here the interests of the parties to an instrument appear clear and unambiguous from the instrument itself, the Court should look

parties who own unleased and outstanding interests.

If those mineral interests are already under lease, the parties desiring to drill may purchase the leases from the holders of the leases. If the parties holding such leases wish to participate in the well, the parties may "farm-out" their leased interest to the parties desiring to drill the well. In such an event the original leaseholders pay their proportionate share of the production if the well is a producer.

When the original leaseholder of a mineral lease sells (or "farms-out") its mineral rights to a purchaser wishing to drill in the leasehold, the purchaser acquires a "farm-in."

7

solely to the instrument and give same effect as written." *Barnett v. Getty Oil Co.,* 266 So.2d 581, 586 (Miss. 1972). *See also Century 21 Deep South Properties, Ltd. v. Keys*, 652 So.2d 707, 716-17 (Miss. 1995). It is by this standard that we, too, review the language of the Exploration Agreement and all other agreements incorporated therein.[7]

### A. CMR's Claims

CMR first claims that Exxon violated the Exploration Agreement by failing to "propose" the first development well, Southern Mineral No. 2. CMR points to the unambiguous language of Paragraph 8 of the Exploration Agreement.[8] CMR asserts that Paragraph 8

---

[7] The parties incorporated an Operating Agreement and several attachments into the Exploration Agreement.

[8] Paragraph 8 of the Exploration Agreement reads in pertinent part:

> If at the time each new exploratory well is proposed . . . then the consenting party shall by earning the non-consenting party's contractual interest in said exploratory well likewise earn the non-consenting party's rights to said non-consenting contractual interest to propose, drill, and complete or plug and abandon development wells which are drilled in offsetting contract units provided that no more than one hundred and eighty (180) days shall elapse between the date said exploratory well is completed . . . and the actual commencement of drilling of the first development well drilled in an offsetting contract unit to said exploratory well . . . . At such time as said consenting party fails to drill such development wells on said one hundred and eighty (180) day continuous basis and carry said non-consenting party's contractual interest, all unearned rights attributable

8

requires the proposal of development wells based merely on the fact that the word "propose" appears in the language of Paragraph 8, which pertains to development wells.  CMR also argues that the proposals are necessary because they serve the informational purpose of  allowing CMR to monitor whether Exxon was meeting the 180-day "continuous drilling" time frame required by the contract.  We disagree with CMR's interpretation of the Agreement.

CMR chose not to participate in the Southern Minerals No. 1 exploratory well under Paragraph 7.  As such, Paragraph 8 provides that Exxon obtained the right to earn CMR's interest in the first development well, Southern Minerals No. 2.  By obtaining the right to earn CMR's interest in the well, under the express language of Paragraph 8, Exxon "likewise" earned CMR's "right to propose" the development well.  Furthermore, under Paragraph 7, it appears the purpose of proposing the initial exploratory well was to give CMR a chance to participate in that well.  However, when Exxon earned CMR's interest in the exploratory well, CMR could not participate in the subsequent development wells.  Essentially, proposing the development well at that point would serve no purpose.

As evidence that development wells must be proposed, CMR also points to the beginning language of Paragraph 12: "When a development well is proposed . . . ." This provision, however, is not helpful to CMR, as Paragraph 12 would have only applied if CMR

to said non-consenting party's contractual interest
shall revert to said non-consenting party . . . .

9

had participated in the exploratory well.

CMR also claims that proposal was required even if it could not participate in the development well because CMR needed the information to keep track of whether Exxon was complying with the 180-day continuous drilling time frame. We again disagree.

Under Paragraph 16 of the Exploration Agreement, and under the incorporated Operating Agreement, CMR was given access to all information that Exxon had concerning the contract area: "All parties shall have access at all reasonable times . . . to all information concerning the contract area which is in the possession of any other party." Thus, CMR did not need to rely on the proposal mechanism to acquire needed information.

Since CMR already had chosen not to participate in the Southern Minerals No. 1 exploratory well, we find that Exxon was under no contractual duty to propose subsequent development wells. We thus affirm the judgement of the district court with regard to this claim.

CMR's second claim is that Exxon forfeited its right to CMR's interest in the Southern Minerals No. 2 well, the first development well, because Exxon failed to commence drilling on that well within the 180-day time frame dictated by the Exploration Agreement. In order to rule on this claim, we must decide when Exxon "actually commenced drilling" of the Southern Minerals No. 2 development well.

The district court found the terms "complete" and "actual

10

commencement of drilling" ambiguous, and thus considered parol evidence in determining the parties' intended definition of these terms. Once terms of a contract are found to be ambiguous, "the determination of the parties' intent through extrinsic evidence is a question of fact." *See **Ham Marine, Inc. v. Dresser Indus., Inc.***, 72 F.3d 454, 459 (5th Cir. 1995) (quoting ***Watkins v. Petro-Search, Inc.***, 689 F.2d 537, 538 (5th Cir. 1982)). We review bench trial findings of fact for clear error. *See **Baldwin v. Stadler**,* 137 F.3d 836, 839 (5th Cir. 1998). Such a finding is clearly erroneous "when we are left with a definite and firm conviction that a mistake has been made." ***Sunbeam Oster Co. v. Whitehurst***, 102 F.3d 1368, 1373 (5th Cir. 1996) (quotations and citations omitted).

CMR challenges the district court's determination as to both when the Southern Minerals No. 1 exploratory well was "completed" and when "actual commencement of drilling" began on the Southern Minerals No. 2 development well. We first consider on what date the "actual commencement of drilling" began on Southern Minerals No. 2, as our ruling in this regard may preclude the need for a determination of when the Southern Minerals No. 1 exploratory well was completed.

On March 11, 1985, Griner Well Service drilled the hole for the conductor pipe of Southern Minerals No. 2. The conductor pipe is an essential component of a gas well. It is designed to prevent the hole from caving-in and to support the great weight of the

11

drill pipe.  The conductor pipe consists of a large diameter casing that was placed, in this case, 133 feet in the ground.  The drill is then sent through the conductor pipe in the process of drilling for the gas.

Griner Well Service used a small, truck-mounted "auger rig" to drill the hole for the conductor pipe.  After this was completed, a large drilling rig was used to drill for the gas.  On March 20, 1985, Exxon completed its construction of the larger drilling rig.  On this date, the primary drilling bit broke ground at the base of the conductor pipe.  Accordingly, Exxon reported March 20 as the "spud" date of the well.

The district court determined that drilling "commenced" on Southern Minerals No. 2 on March 11, when Exxon had Griner Well Service drill the hole for the conductor pipe.  The court reasoned that the conductor pipe is an essential part of the well, and Exxon had no choice but to "drill" a hole in which to place the pipe.  Moreover, concluded the district court, if the parties had meant for the "commencement of drilling" to involve the larger drilling rig only, they could have used language to that effect in the contract.

CMR argues on appeal that the conductor pipe is merely a preparatory step to actual drilling.  It contends that actual drilling involves the use of drill equipment capable of uncovering gas, not the digging of a hole for conductor pipe that is necessary to commence later operations.  Thus, according to CMR, drilling did

12

not actually commence on Southern Minerals No. 2 until the well's larger drill-bit broke the surface of the ground.

Unfortunately, the reported case law in Mississippi gives no clear answer to the question of what activities constitute the "commencement of drilling." CMR does cite several cases that it asserts establish that the laying of conductor pipe does not constitute the "commencement of drilling." *See* **Muth v. Aetna Oil Co.**, 188 F.2d 844, 848-49 (7th Cir. 1951), *vacated on other grounds*, 342 U.S. 844 (1951); **Hughes v. Ford,** 92 N.E.2d 747, 749-51 (Ill. 1950). As Exxon points out, however, these cases are distinguishable because they involve bad faith attempts by operators to prolong mineral leases. Presumably these courts would also hold that the bad faith use of the actual drill bit would likewise not constitute the commencement of drilling.

Here, there is no question that the gas that was eventually extracted from the well came up through the hole containing the conductor pipe. Thus, the creation of the conductor pipe hole was part and parcel of the actual drilling process, and was more than mere preparatory activity, such as the gathering of equipment or the clearing of land. Rather, in creating the conductor hole, Exxon actually broke the surface of the land and drilled toward the gas. We cannot find clear error in the district court's determination that in drilling the conductor pipe hole, Exxon actually commenced drilling.

CMR argues that the Southern Minerals No. 1 exploratory well was completed on September 15, 1984, whereas the district court found that this well was completed on September 27, 1984. Because we find that the district court was not clearly erroneous in determining that drilling of the Southern Minerals No. 2 well commenced on March 11, 1985, we do not reach the question regarding the completion date of the Southern Minerals No. 2 well since both the date proposed by CMR and the date determined by the district court fall within 180 days of March 11.

CMR's final claim is that Exxon failed to drill and operate the second development well, Crown-Zellerbach No. 24-11, in accordance with the terms of the Operating Agreement, incorporated by reference into the Exploration Agreement. This claim arises from the fact that Exxon contracted with a third party, Prosper Energy Company, to operate the Crown-Zellerbach No. 24-11. CMR contends that the Operating Agreement expressly appoints Exxon as the sole operator, and that under the Exploration Agreement the Operating Agreement "shall govern all operations under this Exploration Agreement." CMR's argument is that because Exxon entered into a separate operating agreement that designated Prosper Energy Company as the operator of Crown-Zellerbach No. 24-11, Exxon could not earn CMR's interest in that unit.

14

Unlike the Exploration Agreement, which was written by the parties, the Operating Agreement is a standard form. "Exxon" was typed in and appears in two blanks that name the operator. Article V.D. of the Operating Agreement, however, was altered by the parties to include the following introductory phrase: "Except as to wells in which Exxon or one of CMR, et al is operator." Obviously, the Operating Agreement itself contemplates the situation where someone other than Exxon would operate a well. CMR's contention that the Agreement specifies only Exxon as the operator cannot be sustained.

We also reject CMR's argument that the identity of the operator is tied to whether one of the parties can earn the other's interest. This contention finds no support in Paragraph 8 of the Exploration Agreement, which explicitly addresses the procedures necessary for one party to earn the interest of the other. Nowhere in Paragraph 8 is there any mention of the identity of an operator or how the identity of an operator affects the earning of another party's interest.

CMR further argues that a third party is authorized to operate a well under Paragraph 10 of the Exploration Agreement only when CMR and Exxon do not together own a majority of the drilling interests in the drilling unit for that well. We find this argument unpersuasive and contrary to our reading of the contract. Nowhere in Paragraph 10 do we find anything to support CMR's reading of this provision.

15

Paragraph 10 does not address when a third party can operate a well.[9]  Rather, this provision addresses the situation in which one of the parties to the Exploration Agreement desires to contract with a third party.  In such a situation, Paragraph 10 provides that the party wishing to contract with a third party must notify the other party to the Exploration Agreement of all terms and conditions of the contemplated contract.  However, notice is required only when CMR and Exxon do not together own a majority of the drilling interests in the drilling unit for that well.

Paragraph 10 is nothing more than a notice provision. Furthermore, Paragraph 10 is not even applicable in this situation since CMR and Exxon did, in fact, together own the majority of the drilling interests in the drilling unit on which the Crown-Zellerbach No. 24-11 was operated.  Accordingly, we find that neither Paragraph 10, nor any other provision in the Exploration or

---

[9]  Paragraph 10 provides in pertinent part:

> If any party should desire to enter into any agreement or agreements (1) for the drilling of any well or wells (other than Drilling Contracts and related service contracts) in any area in which any drilling unit will contain any part of the contract area, and in which are the parties' interests committed under this exploration agreement will not constitute a majority of the drilling interests, or (2) for farming out any interests in the contract area, said party shall give written notice to all other parties of the specific lands to be covered by said agreement(s) and of all terms and conditions under which said party desires to enter into said agreement(s), together with all other requirements for notice under Article VI.B. [of the Operating Agreement].

Operating Agreements, prohibited Exxon from contracting with a third party to operate the Crown-Zellerbach No. 24-11 well.

## B. Exxon's Claim

Having affirmed the district court's ruling with regard to all claims raised on CMR's cross-appeal, we now turn to Exxon's appeal of the district court's determination that the contract unambiguously entitles CMR to a 1/8 overriding royalty on production from farm-ins acquired solely by Exxon. Cities Services, Clayton Williams, and David Smith owned drilling interests in the contract area. Exxon negotiated with these parties and they "farmed-out" their interests to Exxon.[10] Both Exxon and CMR agree that these farm-ins are "acquisitions" under the terms of the Exploration Agreement.

We note that our "broad standard of review includes the initial determination of whether the contract is ambiguous." *American Totalisator Co. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993). And, whether a contract is ambiguous is a question of law reviewed de novo. *Triad Elec. & Controls, Inc. v. Power Sys. Eng'g,* 117 F.3d 180, 187 (5th Cir. 1997).

With regard to this particular issue, we look to all provisions in the Agreement that address the overriding royalty and

_____

[10] From Exxon's point of view, these farm-outs are considered "farm-ins."

17

all provisions that address acquisitions. Having thoroughly reviewed all such provisions, we find the language dealing with the overriding royalty ambiguous regarding the applicability of the overriding royalty to acquisitions made solely by one party. *See Century Twenty-One v. Keyes*, 652 So.2d 707, 716-717 (Miss. 1995) ("If . . . a careful reading of the instrument reveals it to be less than clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court is obligated to pursue the intent of the parties, and, to determine the intent, must resort to extrinsic aid.").

We turn first to the relevant portions of the Agreement that refer to the overriding royalty. Paragraph 7 of the Exploration Agreement creates "an overriding royalty of one-eighth (1/8) of eight-eighths (8/8) of production allocated to the parties, without any reduction for any royalties and/or any other burdens, and calculated on said non-consenting parties' contractual interest percentage . . . subject to the right of conversion at payout." Paragraph 7 applies to all exploration wells, including Southern Minerals No. 1.

CMR is a non-consenting party as to the Southern Minerals No. 1 well. Since Exxon earned CMR's interest in Southern Minerals No. 1, Exxon acknowledges that it has the obligation, under Paragraph 7, to pay CMR, in addition to its royalty on "actual unleased mineral interests," the overriding royalty on its contractual

18

interest (24%) of the combined working interest controlled by CMR and Exxon jointly. But Exxon does not agree that the combined working interest on which the overriding royalty is calculated includes the working interest acquired by Exxon from the farm-ins.

The same dispute exists under Paragraph 8 regarding the development wells. Since Exxon earned CMR's interest in the Southern Minerals No. 1 well, Paragraph 8 provides that Exxon also obtained the right to earn the interest of CMR in development wells (the remaining 8 wells in the contract area). Since Exxon earned the interest of CMR in the other 8 wells, Exxon incurred the obligation, under Paragraph 8, to pay CMR the same overriding royalty interest. Where we find the Agreement ambiguous is in its silence as how the overriding royalty applies to acquisitions made solely by one party.

In addressing this issue, the district court reasoned that "production allocated to the parties" referred to all working interests of Exxon and CMR, regardless of when and how those interests were acquired. The district court thus found that CMR deserved an overriding royalty interest on all production jointly controlled by the two parties in the contract area, including the production from Exxon's newly acquired interests. While this is a reasonable interpretation of the overriding royalty provision, Exxon asserts an equally plausible interpretation of "production allocated to the parties."

The purpose of the Agreement was to pool the combined

interests of Exxon and CMR, with each party receiving a proportionate contractual interest in the pooled interests based on each party's proportionate contribution to that pool. The contractual interests granted to each party corresponded to the proportionate contribution to the pool by each party. The parties agreed that Exxon's contribution to the pool was 76% of the whole, and CMR's was 24%. But Exxon later acquired additional interests by way of farm-ins. Thus, the district court's ruling grants CMR an overriding royalty in these later-acquired acquisitions for which CMR made no contribution. Exxon contends that to give CMR an overriding royalty on farm-ins which Exxon alone purchased would upset the original calculations of the parties used to determine each party's contractual interest.

Unlike the district court, we find ambiguity in the statement "production allocated to the parties" because it is simply unclear whether "production allocated" refers to working interests acquired solely by one party after the inception of the agreement. Review of the provisions in the Agreement that address acquisitions are not helpful to resolving this ambiguity, and serve only to further confuse the issue.

Exxon calls our attention to Paragraph 13 of the Exploration Agreement as the critical provision of the contract that concerns acquisitions. We, however, do not find Paragraph 13 instructive on the issue of the overriding royalty. Paragraph 13 of the Agreement simply requires Exxon to notify CMR of the farm-in acquisitions and

20

to give CMR the chance "to participate in such acquisition[s], for the dollar price paid and/or possible participation in the drilling of the well, if that be required to earn the farm-out."[11]

Thus, Paragraph 13 only provides a mechanism by which one party can choose to participate in another's acquisition. Paragraph 13 does not speak to whether acquisitions in which one party does not participate become part of the pool of interests to which the overriding royalty applies. Paragraph 13 is not instructive with regard to the overriding royalty.

Though another provision of the contract also brought to our attention by Exxon appears relevant to the issue of the overriding royalty, we find it creates further ambiguity in the contract. As

_____

[11] In this case, both Exxon and CMR agree that participation in the drilling of a well was required in order to participate in the acquisitions.

Preliminary notice of the acquisition of the farm-ins was given by Exxon to CMR by letter after Southern Minerals No. 1 had been proposed but before drilling was commenced. Negotiations regarding the farm-ins had not been completed and the letter stated that "[f]ull information regarding participation in these acquisitions will be provided by separate letter." The parties agree that additional and complete information regarding the farm-ins was never provided by Exxon to CMR.

The district court found that the notice was insufficient to comply with the requirements of Paragraph 13. Thus, CMR was never given its opportunity to participate in the farm-ins. Exxon points out that CMR decided not to participate in the Southern Minerals No. 1 exploratory well and as a result, CMR lost its right to participate in any other development well in the contract area. The district court found that the notice issue was not controlling on the question of whether CMR is entitled to an overriding royalty on the interests acquired by Exxon by way of the farm-ins. We agree with the district court in this respect.

21

previously discussed, the Operating Agreement is incorporated by reference into the Exploration Agreement as Exhibit II.[12]

Exhibit A to Exhibit II has five separate provisions. The third provision pertains to the "percentages or fractional interest of parties to this Agreement." In this provision, the parties agree to the contractual interest percentages of Exxon (76%) and CMR (24%). This provision also includes a statement pertaining to acquisitions: "An Acquisition by less than all of the Parties shall not affect the percentages of parties to this agreement except as to the Contract Unit[s][13] in which all or any part of said Acquisition may be included." We consider this statement in light of Paragraph 8, the applicable overriding royalty provision of this contract.

Paragraph 8 provides that the overriding royalty is "calculated on said non-consenting party's (CMR's) contractual interest." Contractual interest is defined in Exhibit I as "the contractual percentage interest attributable to each party as shown on Exhibit A."

Exhibit A, however, seems to provide that the contractual percentages are not "affected" when fewer than all parties participate in an acquisition "except as to the Contract Unit[s] in

---

[12] Exhibit I to the Exploration Agreement is a list of definitions clarifying the meaning of terms used in the agreement.

[13] The Contract Unit is the area ultimately established for the well to be drilled.

22

which [the] Acquisition may be included."  This provision seems to suggest that percentages of contractual interests change with respect to wells drilled in contract units where there are acquisitions made solely by one party.  If this is the case, it is unclear to this Court whether the overriding royalty that is "calculated on said non-consenting party's contractual interest" is calculated on the original overall contractual interest, the contractual interest in a particular contract unit, or some combination thereof.

We find that the phrase "production allocated to the parties . . . calculated on said non-consenting party's contractual interest" is ambiguous.  The intent of the parties simply can not be determined from the language, and thus, the district court was obligated to pursue the intent of the parties, and, to determine the intent, should have examined parol evidence.  *Century Twenty-One v. Keyes*, 652 So.2d 707, 716-717 (Miss. 1995).

For the foregoing reasons, we AFFIRM the district court's rulings on CMR's claims and VACATE the decision of the district court that the Exploration Agreement is unambiguous with respect to whether CMR is entitled to an overriding royalty on Exxon's farm-in acquisitions.  Accordingly, we REMAND this case for the consideration of parol evidence to determine the parties' intent with respect to that issue.