IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-20893
_____

ATKEMIX THIRTY-SEVEN INCORPORATED,

Plaintiff - Counter Defendant - Appellant,

v.

COASTAL PRODUCTS AND CHEMICALS INCORPORATED,

Defendant - Counter Claimant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-95-CV-1369)
_____

January 14, 2000

Before KING, Chief Judge, and SMITH and STEWART, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Atkemix Thirty-Seven, Inc. appeals from the district court's judgment that Defendant-Appellee Coastal Products and Chemicals, Inc. did not breach the parties' real estate purchase agreement, and that as a result, it was entitled to both the return of its escrow deposit and attorney fees. We reverse.

I. FACTUAL AND PROCEDURAL BACKGROUND

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

During the latter part of 1994, Coastal Products and Chemicals, Inc. ("Coastal") and Atkemix Thirty-Seven, Inc. ("Atkemix") entered into negotiations for the sale of two of Atkemix's Harris County properties: the Greens Bayou Property ("Greens Bayou"), a parcel of approximately 110 acres, and the Pasadena Property ("Pasadena"), a parcel of approximately 3.5 acres. The parties eventually agreed that the properties would be sold at fair market value, and had appraisals done to assist in finalizing the purchase price. Appraisals valued Greens Bayou at $2 million and at $2.4 million. Pasadena was not appraised. The parties subsequently agreed on a purchase price of $1.5 million for both properties. At Coastal's request, $1.2 million of the agreed-upon price was allocated to Greens Bayou and the remaining $300,000 was allocated to Pasadena. Coastal also requested that two separate agreements be executed. The two documents, the Greens Bayou Purchase Agreement and Pasadena Purchase Agreement, were each effective January 20, 1995. After both were executed, Coastal deposited $100,000 in escrow ($50,000 for each of the properties) as dictated by the two agreements. These funds were held by Stewart Title Guaranty Company ("Stewart Title"), the title insurance company involved in the transaction. Stewart Title had sent to the parties a Commitment for Title Insurance dated January 17 describing the terms under which it was willing to provide title insurance covering Pasadena.

The parties met on February 7, 1995 to close on the two properties. At that time, Coastal brought to Atkemix's attention

2

the fact that the metes and bounds description in a recorded easement agreement allowing Atkemix to use a road across adjacent property to have access to the landlocked Pasadena did not comport with the location of the actual road. Because the "easement problem" raised a question of whether Atkemix was able to convey a legal right of access to Pasadena, Coastal refused to close on that property. This caused Atkemix to refuse to close on Greens Bayou, as Atkemix's obligation to convey Greens Bayou was expressly conditioned on the completion of the sale of Pasadena.

The parties entered into discussions and on February 10, 1995, executed a Letter Agreement that dealt with the easement problem and the sale of Greens Bayou. Under the Letter Agreement, Greens Bayou would be conveyed to Coastal for $1.2 million. Additional language, which is the focus of the instant dispute, dealt with the sale of Pasadena. The Letter Agreement contained a "pay or close" provision that required Coastal to pay Atkemix $200,000 (the $50,000 in escrow plus an additional $150,000) if for any reason Coastal chose not to close on Pasadena. Coastal's obligation to "pay or close" was contingent on Atkemix's having satisfied requirements set forth in two clauses. One clause gave Atkemix three choices as to the form of the documents that it could tender. Under the first option, Atkemix could tender documents in form of exhibits attached to the Letter Agreement. One of those exhibits included language that quitclaimed Atkemix's recorded easement rights. Under the

3

second option, Atkemix could amend the documents described in its first option with corrected easement agreements. Finally, Atkemix could tender documents in another form that was agreeable to Coastal. The second clause required Atkemix to meet its "other obligations for closing." The parties agreed that the date for closing on Pasadena would be March 14, 1995, or an earlier, mutually acceptable date. Shortly after February 10, 1995, the parties closed on Greens Bayou.

Atkemix attempted to come to an agreement with the owner of the adjacent property, Phillips Petroleum, Inc. ("Phillips"), over how best to resolve the discrepancy between the location of the actual road over its property and the location described in the recorded easement. By March 13, no agreement had been reached. As a result, Atkemix wrote Coastal of its intention to tender documents in accordance with the first of the three options it had under the Letter Agreement. In the same letter, Atkemix informed Coastal that Phillips had "confirmed orally on several instances to Atkemix that the existing roadway location is the easement to the Pasadena Property" and that Phillips was "willing to execute a document reconfirming the location and existence of the access easement if requested by Atkemix or its successors in interest."

On March 14, Stewart Title submitted to the parties a revised Commitment for Title Insurance that included a new paragraph describing the easement problem and noting that a new recordable easement agreement was needed prior to closing. The

4

parties dispute the implications of Atkemix's failure to comply with this provision.  Later the same day, Atkemix tendered the documents it had stated it would.  Coastal refused to close, and paid nothing to Atkemix.  Atkemix did not authorize Stewart Title to release the $50,000 it still held.

On May 4, 1995, Atkemix filed this diversity suit against Coastal alleging a breach of the Letter Agreement, and seeking damages, a declaratory judgment that Atkemix was entitled to the $50,000 escrow deposit, and attorney fees.  Coastal counterclaimed, alleging breach of contract and tortious interference, and seeking the return of its $50,000 escrow deposit.  After the case was tried but before the district court rendered its judgment, Stewart Title interpleaded the $50,000 escrow deposit, and filed a summary judgment motion seeking release from liability to both Atkemix and Coastal.  Holding that Coastal had not breached the Pasadena Purchase Agreement, the court's judgment awarded nothing to Atkemix, awarded Coastal the escrow deposit and attorney fees, and released Stewart Title from any liability.  The lower court also concluded that the "pay or close" provision in the Letter Agreement was unenforceable due to a lack of consideration.  Atkemix timely appeals.

## II.  THE ESSENCE OF THE DISPUTE

The dispute between Atkemix and Coastal has at its center the easement problem — the discrepancy between how an easement is described in recorded documents and the actual location of the

road that is used to access Pasadena.  No one contends that the discrepancy made Pasadena currently inaccessible.  The two corporations are before us because they disagree on whether Atkemix was contractually obligated to obtain corrected easement agreements, i.e., fix the easement problem, in order to trigger Coastal's obligation to "pay or close."

The parties arguments, in a nutshell, are as follows. Atkemix, pointing to Coastal's agreement to allow Atkemix to quitclaim its recorded easement rights, maintains it was not obligated to fix the easement problem.  Upon tender of documents described in the Letter Agreement and the fulfillment of Atkemix's other obligations for closing, Coastal had to pay either a total of $200,000 if it chose not to close or $300,000 if it chose to close.  Atkemix contends that it performed its obligations under the Pasadena Purchase Agreement, as amended, and thus Coastal's refusal to pay or close is a breach of contract.

For its part, Coastal admits that it agreed to accept a quitclaim of Atkemix's recorded easement rights.  It insists, however, that Atkemix had to fix the easement problem nonetheless in order to fulfill its other obligations for closing.  Those obligations, Coastal maintains, included ensuring that Stewart Title provided Coastal with a title insurance policy that covered the easement at issue.  Coastal contends that Stewart Title required the easement problem to be fixed before it would issue a policy.  Because Atkemix did not fix the easement problem, it

6

could not obtain the required title insurance policy. Therefore, Coastal's obligation to pay or close was not triggered.

We can resolve the dispute between the parties by answering one crucial question: whether Atkemix was obligated under the Pasadena Purchase Agreement, as amended, to obtain a title insurance policy in Coastal's name that insured that the easement was without defect. We find, in part because Coastal waived its termination right and agreed to allow Atkemix to quitclaim its easement rights, that it also agreed to accept a title insurance policy that excepted for the easement at issue. It simply is not reasonable to think that Coastal agreed to waive its right to terminate the Pasadena Purchase Agreement and to accept a quitclaim deed on the easement and at the same time required Atkemix to provide a title policy insuring good and marketable fee title to the easement in Coastal. Absent special circumstances not present here, a title insurance company will not respond to a quitclaim by insuring good and marketable title in the buyer. As a result, we conclude that district court erred in holding that Coastal did not breach the parties' agreement. The nuts and bolts of our reasoning follow.

### III. PASADENA PURCHASE AGREEMENT, AS AMENDED

Resolution of the parties' dispute requires interpretation of the Pasadena Purchase Agreement, as amended by the Letter Agreement of February 10. We review a lower court's contract interpretation de novo, unless that interpretation turns on a

7

consideration of extrinsic evidence of the parties' intent.  See Chastant v. Headrick Outdoor Inc., 81 F.3d 31, 33 (5th Cir. 1996).  Under those circumstances, we review for clear error.  See id.  Here, the district court restricted itself to the documents.  It is the case, however, that "[o]ur 'broad standard of review includes the initial determination of whether the contract is ambiguous.'" Exxon Corp. v. Crosby-Mississippi Resources, Ltd., 154 F.3d 202, 209 (5th Cir. 1998) (quoting American Totalisator Co. v. Fair Grounds Corp., 3 F.3d 810, 813 (5th Cir. 1993)).

The parties' agreement specified that Texas law would govern questions of construction and enforcement.  Under Texas law, the primary concern of courts interpreting contracts "is to ascertain and to give effect to the intentions of the parties as expressed in the instrument." R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980).  We first consider the facts and circumstances surrounding the execution of the agreement in order to ascertain whether the agreement is ambiguous, or is capable of only a single meaning.  See National Union Fire Ins. Co. v. CBI Indus., 907 S.W.2d 517, 520 (Tex. 1995)(per curiam); Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981); City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex. 1968).  Only if the contract is found to be ambiguous may we consider extrinsic evidence of the parties' intent.  See Sun Oil Co., 626 S.W.2d at 732 ("Where the meaning of the contract is plain and unambiguous, a party's

8

construction is immaterial."); R & P Enters., 596 S.W.2d at 519. Under these circumstances, we may take into account parol evidence, see Friendswood Dev. Co. v. McDade + Co., 926 S.W.2d 280, 282 (Tex. 1996), the parties' behavior under the contract, cf. Sun Oil Co., 626 S.W.2d at 732 (taking issue with lower court's use of one party's actions under the contract to interpret its provisions when the contract was unambiguous), and other extrinsic evidence in order to assist us in ascertaining the parties' intent.

A.  *Whether the Pasadena Purchase Agreement, as Amended,
Is Ambiguous*

Our first task is to determine whether the Pasadena Purchase Agreement, as amended, is ambiguous.  In performing this task, we must look at the agreement as a whole in light of the circumstances existing at the time of execution.  See Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 529 (Tex. 1987).  After negotiating over terms for several months, the parties arrived at one figure for both properties.  At the request of Coastal, that figure was allocated to the two properties in the manner it suggested.  Also at the request of Coastal, two agreements were executed.  At the same time the original Pasadena agreement was executed, the parties signed the Greens Bayou Purchase Agreement. That Agreement included a specific provision that required that "Buyer shall have . . . (ii) satisfied all of the conditions precedent to the closing of the sale of said Pasadena Property as set forth in Article 7 of said Purchase Agreement and, the

9

Closing of the sale of the Pasadena Property as set forth in Article 8 of said Purchase Agreement shall have been completed." By this time, the parties also had received from Stewart Title a Commitment for Title Insurance with an issue date of January 17, 1995 that described the terms of the policy it was willing to provide. That Commitment included three schedules: Schedule A, which described the property and the amount of coverage; Schedule B, which listed twenty exceptions to coverage; and Schedule C, which described eight requirements under a pre-printed introduction that stated:

> Your policy will not cover loss, costs, attorney fees, and expenses resulting from the following requirements that will appear as Exceptions in Schedule B of the Policy, unless you dispose of these matters to our satisfaction, before the date the Policy is issued.

Among the items listed on Schedule C was that "[s]atisfactory evidence must be provided that . . . there is legal right of access to and from the land."

The circumstances facing the parties at the time they executed the Letter Agreement were different from those that existed at the time the Pasadena Purchase Agreement was signed. Coastal had discovered the easement problem and had refused to close on Pasadena as a result. With the permission of Atkemix, Coastal was in possession of Greens Bayou. It had begun operations there and was facing manufacturing, or other deadlines. But Atkemix had refused to close on Greens Bayou if the sale of Pasadena was not first completed. The parties

executed the Letter Agreement in an effort to resolve their immediate dilemma.

When viewed in light of these, and the other circumstances facing the parties, we do not find the Pasadena Purchase Agreement, as amended, ambiguous. We will therefore restrict our review to the agreement and enforce it as written.[1]

B. *Whether Atkemix was Required to Fix the Easement Problem in Order to Trigger Coastal's Obligation to "Pay or Close"*

Coastal argues that Atkemix failed to fulfill its "other obligations for closing" under the February 10 Letter Agreement. For this reason, Coastal contends, it was not required to pay anything when it decided not to close on Pasadena. In order to assess the merits of this argument, we must discern what Atkemix was obligated to do under the Pasadena Purchase Agreement, and how, if at all, its obligations were modified by the Letter Agreement.

---

[1] In response to Atkemix's claims, Coastal looks to Atkemix's attempts to fix the easement problem and its request for an extension of the contractual closing date as evidence that Atkemix knew it was obligated to fix the easement problem. In light of our determination that the contract is unambiguous, we may not consider parties' behavior as an indicator of intent. See Sun Oil Co., 626 S.W.2d at 732. Even if we were to determine that the contract was ambiguous, Atkemix's attempts to fix the easement problem would not be conclusive. Atkemix stood to gain an additional $100,000 and other benefits if in fact the parties closed on Pasadena. Those benefits could easily explain its attempts to fix the problem despite not being contractually obligated to do so.

11

### 1. Original Terms of the Pasadena Purchase Agreement

Under section 4.2 of the Pasadena Purchase Agreement, Coastal's "acceptance of the Grant Deed from [Atkemix] for [Pasadena] at the Closing on the Closing Date and the issuance of a title insurance policy to [Coastal] by [Stewart Title] on the Closing Date . . . [would] conclusively establish that [Atkemix] conveyed the Property to [Coastal] . . . and [would] discharge in full [Atkemix's] obligations under § 4.1 . . . ." Section 4.1 lays out Atkemix's obligations with respect to the Grant Deed. Atkemix was to

> convey to [Coastal] good and marketable fee title to the Property, by a duly executed and acknowledged Grant Deed (the "Grant Deed") in the form of Exhibit B attached hereto, free and clear of liens, encumbrances, leases, easements, restrictions, rights, covenants and conditions, except the following (the "Permitted Exceptions"): (a) the title exceptions in the Preliminary Report [and approved (or deemed to be approved) by Buyer pursuant to section 1.2 hereof], (b) title exceptions shown by a correct survey of the Property or a physical inspection of the Property, and (c) any other matters created, permitted or approved by Buyer."

The Property is described in section 1.1 as the real property "commonly known as 1000 Jefferson Street, together with the improvements on such real property, the easements and rights appurtenant to such real property".

Atkemix's obligations with regard to title insurance are listed in section 7.2(c), under the heading of "Conditions Precedent":

> On the Closing Date, the Title Company shall be prepared to issue to Buyer a policy of title insurance (or such equivalent title insurance coverage then in effect), with liability equal to the total purchase

12

price for the Property, insuring Buyer that fee title to the Property is vested in Buyer subject only to the Permitted Exceptions.

In summary, under sections 4.1, 4.2, and 7.2(c), Atkemix was required to convey good and marketable fee title to the real property and to appurtenant easements, and arrange for a title insurance policy, with the title and the insurance policy subject only to "Permitted Exceptions." Because the only definition of "Permitted Exceptions" in the Pasadena Purchase Agreement occurs in section 4.1, the Permitted Exceptions for purposes of section 7.2(c) must be as defined in section 4.1.

Permitted Exceptions under section 4.1 included those exceptions in Stewart Title's preliminary reports that were approved of, or deemed approved of, by Coastal. Section 1.2, referenced in section 4.1, provided Coastal with means of terminating the Pasadena Purchase Agreement. Under section 1.2(d), Coastal had until February 27 to object, in writing, to title exceptions in Stewart Title's preliminary reports. If Atkemix received such an objection, it had until March 1 to elect either to remove or not remove the objection. If it decided to remove the objection, it had until the closing date to do so. If it chose not to remove the objection, Coastal could, on or before March 1, terminate the agreement or withdraw the objection. If termination was not chosen, Coastal would be deemed to have withdrawn the objection and approved title subject

to the exception.[2]  The record provides no indication that Coastal had, on or before February 10, exercised its rights under this provision.

## 2.  The February 10 Letter Agreement

At issue in this case is how the parties' Letter Agreement of February 10 affected Atkemix's obligations.  The Letter Agreement deals with both the sale of Greens Bayou and the sale of Pasadena.  In paragraph 1 of the Letter Agreement, Atkemix agreed to the sale of Greens Bayou prior to closing on Pasadena. Paragraph 2 of the Letter Agreement provided that, "[e]xpressly conditioned on Seller's compliance with" paragraph 1:

   a.  Coastal agrees to waive Coastal's right to terminate the Pasadena Contract under Sections 1.2(a) and 1.2(d) of the Pasadena Contract.
   b.  Coastal and Seller agree that the "Closing Date" under the Pasadena Contract will be March 14, 1995 or such earlier date as shall be established by written agreement of the parties.
   c.  Coastal agrees that if: (i) Seller is able to tender (and in fact does tender) Exhibits A and B to the escrow "Grant Deed" under the Pasadena Contract in the form attached hereto (or in a form substantively identical thereto, which shall include tendering of such Grant Deed with one or more current or corrected equivalent easements which may be added to the Deed and correspondingly to the exceptions in Exhibit B but over the road described in easement number F-279857 as currently existing), or in other form hereafter approved in writing by Coastal; (ii) Seller tenders performance of its other obligations for closing under the Pasadena Contract; and (iii) Coastal refuses to or elects not to close the purchase of

---

[2]  This was not the only means of terminating the Pasadena Purchase Agreement. Under section 1.2(a), Coastal could terminate the Agreement by providing Atkemix written notice on or before March 1, 1995 that Coastal had found the property "unacceptable."

14

the Pasadena Property, then, as an addition to the $50,000 Deposit under the Pasadena Contract to be delivered and paid to Seller as liquidated damages, Coastal shall pay and deliver an additional $150,000, for an aggregate payment to Seller thereunder of [$200,000].

Exhibit A attached to the Letter Agreement included the following language in addition to a description of the metes and bounds of Pasadena:

Together with [all grantor's right, title and interest in] easements as set forth in instruments recorded under Clerk's File Nos. F-279856, F-279857, and F-279859 of the Real Property Records of Harris County, Texas.

The portion in brackets above was interlineated.

Paragraph 2(c)(i), as Coastal has admitted,[3] gives Atkemix the choice of fixing, or not fixing, the easement problem. Coastal argues that despite the language in paragraph 2(c)(i), Atkemix remained obligated under paragraph 2(c)(ii) to fix the easement problem prior to closing. It contends that under sections 7.2(c) and 8.1(e)[4] of the Pasadena Purchase Agreement, and under the documents provided by Stewart Title, Atkemix was required to ensure that Stewart Title was prepared to issue a

---

[3] Coastal agreed that pursuant to the terms of the Letter Agreement, Atkemix was given "the option of rectifying the discrepancy with the access easement, and was provided time to do so. However, the Letter Agreement clearly provided that [Seller] was not required to rectify that discrepancy." See Joint Pre-Trial Order, R44 at 7.

[4] Under section 8.1(e) of the Pasadena Purchase Agreement, "The Title Company shall issue to Buyer the title insurance policy described in section 7.2(c) hereof." Section 8.1 begins with "Seller and Buyer shall cause the following to occur at the Closing on the Closing Date," and thus presents obligations on the part of both parties.

15

title insurance policy that did not include the easement problem as an exception, and that such a policy would be issued at closing.

Coastal believes that the following language in Schedule C of Stewart Title's March 14 revised Commitment[5] strongly supports its position:

> Both Purchaser, Seller and we have been informed that the access easement abutting the property and continuing to the dedicated road is different on the ground than as set forth in the original easement grant of which both are reflected on the current survey. Therefore, prior to closing we must be furnished with an easement agreement that defines the easement as it exists on the ground, in recordable form to be executed by the fee estate owner of which the easement tract traverses and to be also joined in by any lienholder, if any.

Coastal interprets this language to require that Atkemix fix the easement problem (i.e., submit recordable documents that defined the easement as it actually existed) in order for a policy to issue. Because Atkemix was required under section 7.2(c) to ensure that Stewart Title was prepared to issue a policy, its failure to provide the title company with the required evidence of legal right of access resulted in its failure to fulfill its contractual obligations. Moreover, because the above language was located in Schedule C of the revised Title Commitment, and not in Schedule B, Coastal contends that the easement problem was not a Permitted Exception under the Pasadena Purchase Agreement.

---

[5] The revised Commitment again contained three Schedules (A, B, and C). There were seventeen items listed on Schedule B (down from twenty), and nine items on Schedule C (up from eight). The legal description of the property given on Schedule A included reference to recorded easements.

16

The district court agreed with Coastal that Atkemix was obligated to fix the easement problem before Coastal was required to pay Atkemix anything. Our review of the Pasadena Purchase Agreement, as amended, causes us to conclude that the district court erred in so deciding.

3. Permitted Exceptions Under the Pasadena Purchase Agreement

We cannot accept Coastal's interpretation of the Pasadena Purchase Agreement, as amended, and of Stewart Title's documents. Contrary to what Coastal urges, language in the Stewart Title's revised Commitment for Title Insurance does not support its contention that the title company required Atkemix to fix the easement problem prior to closing in order for the policy to issue. The pre-printed portion of Schedule C clearly states the implication of Atkemix's failure to meet the listed requirement by fixing the easement problem prior to closing: The easement at issue would be described on Schedule B and exist as an exception to coverage. Thus, the policy would issue, but would issue with the additional exception. This is consistent with Stewart Title's March 15 fax to both parties of revised Schedules A and B (but no Schedule C), with Schedule B now including reference to the easement problem.

Because Stewart Title did not require that Atkemix fix the easement problem in order for a policy to issue, Coastal must

17

find support in the Pasadena Purchase Agreement, as amended, for its argument that Atkemix was nonetheless required to correct the problem. As noted above, Atkemix was obligated under section 7.2(c) to ensure that Stewart Title was prepared to issue a policy "insuring [Coastal] that fee title to the Property [was] vested in [Coastal] subject only to the Permitted Exceptions." Coastal argues that it never agreed to allow Atkemix to obtain title insurance that included the easement problem as an exception. The dispute between the parties thus reduces to the question of whether Coastal agreed to such a policy.

In order to evaluate Coastal's contentions regarding the nature of the title insurance policy it agreed to accept, we must keep in mind the purpose of such policies, and in particular, what a company such as Stewart Title agrees to when it issues an insurance policy. The Tenth Circuit, evaluating a claim of breach of a title insurance policy, provided the following description of the purpose, and limitations, of such policies:

> Title insurance is merely a contract to indemnify the insured for any losses incurred as a result of later found defects in title. Title insurance does not insure the value of the subject property; it insures only that the title to such property is unencumbered by unknown liens, easements, and the like which might affect the property's value. In other words, a title insurance policy is not analogous to a warranty of title found in a deed which is breached, if at all, at the time it is made.

First Fed. Sav. & Loan Ass'n v. Transamerica Title Ins. Co., 19 F.3d 528, 530 (10th Cir. 1994)(citations omitted); see also Youngblood v. Lawyers Title Ins. Corp., 923 F.2d 161, 163 n.2 (11th Cir. 1991)("'[A] title insurance policy is not an agreement

18

to guarantee the state of title, but is, rather, an agreement to indemnify the policy holder.'" (quoting D. Barlow Burke, Jr., Law of Title Insurance, § 1.3.1. at 18 (1986))); Martinka v. Commonwealth Land Title Ins. Co., 836 S.W.2d 773, 777-78 (Tex. App. 1992, writ denied) (describing law governing the title insurance business). Understanding that a title insurance policy does not operate to warrant title, but instead indemnifies the insured if subsequently discovered title defects result in losses, we can now evaluate Coastal's claims.

Coastal argues that because the easement problem was not listed in Schedule B of Stewart Title's Commitment prior to March 15, it did not agree to allow the problem to be excepted from a title insurance policy. This would be a stronger argument were it not the case that the appearance in title insurance documents of a listed exception was not required in order for a problem to be considered a Permitted Exception under the Pasadena Purchase Agreement. Section 4.1 provides three avenues for the creation of a Permitted Exception, only one of which deals with exceptions listed by Stewart Title. Coastal could, through operation of section 1.2(d), approve, or be deemed to have approved, title exceptions listed in the Stewart Title's Preliminary Report. Coastal's argument focuses on this avenue. However, Permitted Exceptions could also be "title exceptions shown by a correct survey of the Property or a physical inspection of the Property." Finally, Permitted Exceptions include "any other matters created,

19

permitted or approved by Buyer" (emphasis added).[6]  Under section

9.5 of the Pasadena Purchase Agreement, "[t]he words 'approval,'

'consent' and 'notice' shall be deemed to be preceded by the word

'written.'"  Thus, written approval was required.

Coastal maintains no such approval was given.  It is clear,

however, that Coastal entered into certain agreements pertaining

to the easement problem when it executed the Letter Agreement of

February 10.  On that date, Coastal knew of the easement problem.

From the Title Commitment dated January 17, it also had notice

that Stewart Title would list access-related problems as an

exception if it was not supplied with evidence of legal right of

access to and from Pasadena.  Finally, prior to entering into the

Letter Agreement on February 10, Coastal had the ability, via

section 1.2(a),[7] to terminate the Pasadena Purchase Agreement by

---

[6]  "Other matters" would cover access issues regardless of
whether those issues were considered defects in title, per se.
See LEE R. RUSS, COUCH ON INSURANCE ch. 159, at 78 (3d ed. 1998)
("Ability to access a parcel of real estate . . . is not
technically a 'defect' in the title of the property.").

[7]  Section 1.2(a) provides that:

Buyer shall, in good faith and with diligence, at
Buyer's expense, review and investigate the physical
and environmental condition of the Property, the
character, quality and general utility of the Property,
the zoning, land use, environmental and building
requirements and restrictions applicable to the
Property, and the state of title to the Property. . . .
Buyer shall determine whether or not the Property is
acceptable to Buyer within the Property Approval
Period. If, during the Property Approval Period, Buyer
determines that the Property is not acceptable, Buyer
shall have the right, by giving notice to Seller on or
before the last day of the Property Approval Period, to
terminate this Agreement.

simply giving Atkemix written notice.  Nonetheless, Coastal executed the Letter Agreement.  In it, Coastal allowed Atkemix to tender a documents that quitclaimed its recorded easement rights and waived its rights to terminate the Pasadena Purchase Agreement through the procedures established in sections 1.2(a) and 1.2(d) of that Agreement.[8]

We find that by agreeing to the terms of the Letter Agreement, Coastal approved, in writing, Atkemix's option to arrive at closing without evidence that it had legal right of access to and from Pasadena, and thereby made the easement problem a Permitted Exception under the third of section 4.1's means of creating such exceptions.  Section 4.1 speaks to the form of the Grant Deed that Atkemix was to tender; the Letter Agreement allows Atkemix to tender documents in the form of exhibits attached to it.  Those exhibits included new language quitclaiming Atkemix's recorded easement rights.  Coastal therefore agreed, in writing, to allow Atkemix to tender fee title to Pasadena, with the exception of its recorded easement rights, which Atkemix could quitclaim.

---

The Property Approval Period ran from October 7, 1994 to March 1, 1995.

[8] Because the Letter Agreement expressly stated that Coastal waived its termination rights under sections 1.2(a) and 1.2(d) of the Pasadena Purchase Agreement, we find the district court's conclusion that "[a]ny preexisting right Coastal had under the original Pasadena Purchase Agreement to terminate the deal if Atkemix failed to obtain legal access to the Pasadena property by the time of closing was not waived by Coastal's execution of the Letter Agreement" in error.

In addition, Coastal's waiver of rights under section 1.2(d) meant that it would no longer have the ability to terminate if Stewart Title included the easement problem (or any other title exception) in any revised document submitted to the parties prior to February 27. Although section 1.2(d) required some action on the Atkemix's part to trigger Coastal's termination rights, this was not the case under section 1.2(a). That section gave Coastal the ability to terminate the agreement for virtually any reason by merely submitting written notice to Atkemix. If it did so, the Pasadena Purchase Agreement provided that the $50,000 deposit, plus interest, would be returned to Coastal. Rather than exercising its option to terminate the Agreement under section 1.2(a), Coastal agreed to waive that option. The effect of this was to deem the property, with a quitclaim of recorded easement rights, "acceptable."

Because the lack of evidence of legal access to and from Pasadena was a Permitted Exception under section 4.1, it was also a Permitted Exception under section 7.2(c). In this way, Coastal allowed Atkemix to not fix the easement problem and nonetheless fulfill its obligations under section 7.2(c) by ensuring that Stewart Title was "prepared to issue . . . a policy of title insurance . . . insuring Buyer that fee title to the Property is vested in Buyer subject only to the Permitted Exceptions." Once Coastal agreed to allow Atkemix to quitclaim its recorded easement rights, it could not expect that Stewart Title would issue a policy that insured fee title to the easement, free of

defects, in Coastal. As we said earlier, a title insurance company cannot reasonably be expected to respond to a quitclaim by insuring good and marketable title in the buyer.

This interpretation of the Pasadena Purchase Agreement, as amended, also prevents us from having to render portions of the Letter Agreement meaningless. See Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1998); R & P Enters., 596 S.W.2d at 519 ("[T]he Court will examine and consider the entire instrument so that none of the provisions will be rendered meaningless."). Coastal's basic argument is that, despite paragraph 2(c)(i)'s language allowing Atkemix to tender documents that quitclaimed its easement rights, i.e. allowing Atkemix to not fix the easement problem, Atkemix was nonetheless obligated under paragraph 2(c)(ii) to fix the easement problem. Interpreting paragraph 2(c)(ii) in the manner Coastal urges would render meaningless language in paragraph 2(c)(i) that provides Atkemix with options regarding the form of documents it could tender at closing.

Once Atkemix tendered the documents allowed under the Letter Agreement and ensured that Stewart Title was willing to issue title insurance subject only to Permitted Exceptions, Coastal had the option of closing on Pasadena or not closing. If it chose the latter option, it was obligated to pay an additional $150,000. There were no other options. It had waived all its rights to terminate the Pasadena Purchase Agreement on February 10, and even if that had not occurred, the operative deadline for

23

terminating the agreement, March 1, had passed.  In failing to close or pay, Coastal breached the Pasadena Purchase Agreement, as amended.  The district court erred in concluding otherwise.

The district court also erred in concluding that the "pay or close" provision within the Letter Agreement was unenforceable because it was not supported by consideration.  It is clear from the Letter Agreement itself and the circumstances surrounding its execution that the provision does not fail for lack of consideration.  The "pay or close" provision was introduced with language expressly conditioning the section's terms on Atkemix's sale of Greens Bayou to Coastal.  Thus, Atkemix agreed to allow Greens Bayou to close prior to Pasadena.[9]  In addition, under the terms of the "pay or close" provision, Coastal retained the right to choose not to close even if Atkemix had fixed the easement problem.  Atkemix agreed that it would have "no recourse against Coastal or its assets (other than collection of the above-described $200,000 in liquidated damages) for failing to consummate the purchase of the Pasadena Property" and expressly waived its rights of specific performance and to an action for

---

[9]  The court below may have based its conclusion in part on the misplacement, within the Greens Bayou Purchase Agreement, of language tying the Greens Bayou closing to that of Pasadena. Rather than being included among the conditions that Seller could require as conditions precedent, the paragraph was placed within the section listing items that the Buyer could require as conditions precedent.  The language of the misplaced paragraph demonstrates the mistake:  It talks entirely of Buyer's obligations, using the phrase "Buyer shall."  Under the circumstances, it would be clear error to find that the parties intended to allow Coastal to waive the prior closing on Pasadena, as would be the case if the paragraph was interpreted as being part of the section listing obligations on the part of Atkemix.

24

damages other than the $200,000 (and reasonable attorney fees). Thus, the provision was supported by consideration and the district court erred in concluding otherwise.

## IV.   ATTORNEY FEES

In light of our conclusions above, we must also reverse the portion of lower court's judgment awarding Coastal attorney fees. We remand the issue of Atkemix's attorney fees, which, consistent with the Letter Agreement, it also seeks.

## V.   CONCLUSION

For the reasons above, we REVERSE the district court's judgment as it pertains to Atkemix and Coastal, and REMAND for determination of attorney fees to be awarded Atkemix and for entry of judgment not inconsistent with this opinion.  Coastal shall bear the costs of this appeal.