## AMERICAN TOTALISATOR COMPANY, INC., Plaintiff–Appellee,

v.

## FAIR GROUNDS CORP., Defendant–Appellant.

### Nos. 92–3145, 92–3996.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1993.

Rehearing Denied Oct. 20, 1993.

---

David C. Loeb, Chehardy, Sherman, Ellis & Breslin, Metairie, LA, David L. Stone, George C. Freeman, C. Lawrence Orlansky, New Orleans, LA, for defendant-appellant.

George Denegre, Jr., Edward J. Gay, III, Daniel E. LaGrone, Liskow & Lewis, New Orleans, LA, for plaintiff-appellee.

Before EMILIO M. GARZA and DeMOSS, Circuit Judges, and ZAGEL, District Judge.[1]

DeMOSS, Circuit Judge:

## BACKGROUND

Fair Grounds owns and operates the Fair Grounds Racetrack in New Orleans, Louisiana. It is licensed to conduct pari-mutuel wagering on thoroughbred horse races and to operate off-track betting parlors. Pari-mutuel wagering is a form of gambling. The wagers of betting patrons are formed into pools from which the successful bettors are paid. "Totalisator," or "tote," services are used to receive the wagers, aggregate them into pools, calculate the odds and payout amounts, pay winning tickets, and display and report this information.

American Totalisator Company, Inc. ("AmTote") is one of the oldest and largest providers of tote services and had been Fair Grounds' exclusive provider for many years. In 1988, Fair Grounds and AmTote entered into the totalisator service agreement which is the subject of this dispute. AmTote agreed to provide Fair Grounds with tote services at Fair Grounds' live racing facilities and its off-track betting parlors.

In 1989, Fair Grounds became interested in conducting intertrack wagering on more

---

1. District Judge from the Northern District of      Illinois, sitting by designation.

than three simultaneous intertrack racing programs. However, they discovered that the TIM 300 model terminals did not have the capability to handle four events simultaneously. A dispute regarding the contract arose. Fair Grounds contends that AmTote had a contractual obligation to provide a tote system capable of simultaneously accommodating four racing events. AmTote believes its contractual obligations were satisfied when it furnished the TIM 300 model terminals capable of handling up to three events simultaneously. The service agreement does not expressly state the number of intertrack racetracks that the terminals must accommodate.

In June 1990, Fair Grounds advised AmTote's managers that it wanted to offer intertrack wagering on four simultaneous racing programs and that it considered AmTote to be in breach of contract for failing to provide a system with this capability. A series of meetings and correspondence followed. AmTote offered to modify its system to accommodate intertrack wagering on four simultaneous events by April 1991. However, Fair Grounds terminated the agreement on November 6, 1990.

AmTote subsequently filed a breach of contract action in the Eastern District of Louisiana.[2] Before completion of discovery, the parties filed cross motions for summary judgment. The district court found the 1988 totalisator service agreement unambiguous and granted AmTote's summary judgment motion. Specifically, the district court found that the parties intended Fair Grounds to receive ticket issuing machines that could accommodate simultaneous intertrack wagering on "one or more"—but not necessarily four—intertrack races. Thus, Fair Grounds wrongfully terminated its agreement based on AmTote's system's failure to accommodate simultaneous wagering at all four Louisiana intertrack racetracks.

The district court reserved its ruling on the amount of damages and attorneys' fees pending a stipulation or a trial on this matter. On February 5, 1992, the parties entered a stipulation for $4,159,575 in liquidated damages and $83,752 in attorney costs.

Fair Grounds preserved its right to contest this award on appeal. Fair Grounds then filed its notice of appeal from summary judgment on February 13. The district court entered final judgment on February 21.

On June 16, 1992, Fair Grounds filed a Rule 60(b) motion for relief from the judgment, claiming that newly discovered evidence would show that the TIM 300 model terminal installed was just one of several TIM 300 Series Terminals available during the term of the agreement, and that at least one other model in the series had the capacity to accommodate four or more simultaneous intertrack races. The district court denied the Rule 60(b) motion, and Fair Grounds later filed a notice of appeal from that order.

## JURISDICTION

AmTote contends that this Court is without jurisdiction to hear this appeal because Fair Grounds filed its notice of appeal before the district court had entered a final judgement. The district court ruled from the bench after oral argument and granted summary judgment in favor of AmTote on January 29, 1992. However, the court reserved ruling on damages and attorney's fees pending either stipulation or trial on these amounts. The parties entered a stipulation on February 5, and Fair Grounds filed its notice of appeal on February 13. The district court subsequently entered judgment on February 21, 1992.

Rule 4(a)(1) of the Federal Rules of Appellate Procedure provides that an appellant must file its notice of appeal "within 30 days after the date of entry of the judgment or order appealed from." FED.R.APP.P. 4(a)(1). AmTote maintains that Fair Grounds' notice of appeal—filed prior to the district court's entry of final judgment—was prematurely filed and divests this Court of jurisdiction under 28 U.S.C. § 1291.[3] Fair Grounds responds that Rule 4(a)(2) saves its "technically" premature notice because it was

---

**2.** Federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

**3.** In pertinent part, 28 U.S.C. § 1291 reads: "[t]he court of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."

filed after the district court judge announced a decision and, consequently, is "treated as filed after [the actual] entry [of judgment] and on the day thereof." [4]

Fair Ground's failure to wait until the clerk entered a judgment under Federal Rule of Civil Procedure 58 before filing its notice of appeal is not fatal. The Supreme Court has held:

> Rule 4(a)(2) permits a notice of appeal from a nonfinal decision to operate as a notice of appeal from the final judgment only when a district court announces a decision that *would be* appealable if immediately followed by the entry of judgment. In these instances, a litigant's confusion is understandable, and permitting the notice of appeal to become effective when judgment is entered does not catch the appellee by surprise. Little would be accomplished by prohibiting the court of appeals from reaching the merits of such an appeal.

*FirsTier Mortgage Co. v. Investors Mortgage Ins. Co.*, 498 U.S. 269, 276, 111 S.Ct. 648, 653, 112 L.Ed.2d 743 (1991) (emphasis in original).

Here, it appears that Fair Grounds harbored a reasonable belief when it filed its notice of appeal that the judgment was final. The district court's summary judgment was final upon the entering of the parties' stipulation on liquidated damages and attorneys' fees. All that remained was the clerk's ministerial task of entering a Rule 58 judgment. AmTote does not argue that it would be prejudiced if the premature notice were deemed effective. Since nothing would be accomplished by not allowing us to review the merits of this appeal, we find that Fair Grounds' premature notice of appeal relates forward and is effective as of February 21, 1992, the date of the district court's entry of judgment.

## CONTRACT

The district court determined that the 1988 tote service agreement was unambiguous. Thus, the parties' intention was determined through the plain language of the agreement without the introduction of extrinsic evidence to aid in this determination. Accordingly, AmTote's summary judgment motion was granted. Fair Grounds contends that summary judgment was in error.

■ On appeal, a district court's interpretation of a contract is a matter of law reviewable *de novo*. That is, we review the record independently and under the same standard that guided the district court. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988). This broad standard of review includes the initial determination of whether the contract is ambiguous. *Austin v. Decker Coal Co.*, 701 F.2d 420, 425 (5th Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

■ Under Louisiana law, where the words of a contract are clear and explicit and lead to no absurd consequences, the contract's meaning and the intent of its parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence. La.Civ.Code Ann. art. 2046 (West 1987); *Billingsley v. Bach Energy Corp.*, 588 So.2d 786, 790 (La. App. 2nd Cir.1991). If a court finds the contract to be unambiguous, it may construe the intent from the face of the document— without considering extrinsic evidence—and enter judgment as a matter of law. *National Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir.1990).

■ The 1988 Totalisator Service Agreement requires AmTote to provide the TIM 300 Series Terminals.[5] Exhibit "A," subsection (j) of the agreement sets forth the performance requirements of the TIM 300 terminals.[6] Nothing in that section refers to

---

**4.** Rule 4(a)(2) states: "Except as provided in (a)(4) of this Rule 4, a notice of appeal filed after the announcement of a decision or order but before the entry of the judgment or order shall be treated as filed after such entry and on the day thereof." Fed.R.App.P. 4(a)(2).

**5.** Paragraph 37.2 of the Agreement addresses Intertrack Wagering and provides:

AmTote shall provide to the [Fair Grounds] for its use at the Racetrack a quantity of TIM 300 Series Terminals reasonably calculated to accommodate the Intertrack Wagering handle . . .

**6.** The Agreement defines "TIM 300 Series Terminals" as "the AmTote ticket issuing machine des-

the TIM 300 Series' capability to handle simultaneous intertrack wagering. Fair Grounds concedes that no language exists in this subsection which requires the TIM 300 Series Terminals to be capable of handling simultaneous events. Rather, Fair Grounds argues that this silence creates an uncertainty or ambiguity in the contract. Thus, because the agreement is not clear on its face, a trier of fact must examine extrinsic evidence relating to the parties' intent.

■ We disagree. A contract is not rendered ambiguous simply because the agreement does not expressly impose the obligation in question. *See, e.g., Baber v. Hoffer,* 430 So.2d 220, 221 (La.App. 4th Cir.1983) ("When a clause of a contract is clear and unambiguous, the letter of it should not be disregarded under the pretext of pursuing the spirit."), *Ransom v. Camcraft, Inc.,* 580 So.2d 1073, 1077 (La.App. 4th Cir.1991) ("[T]he rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists...."). Nothing in the 1988 agreement can be construed reasonably as obligating AmTote to provide a system capable of handling intertrack wagering on four simultaneous events. Thus, no such obligation was ever intended by the parties and no such obligation exists. AmTote fulfilled its obligations under the contract by providing the specified equipment in a quantity "reasonably calculated to accommodate the Intertrack Wagering Handle." *See* note 5, supra.

We agree with the district court that the agreement is unambiguous, and, under the plain meaning of its language, we find nothing that obligates AmTote to accommodate a minimum of four simultaneous events. Summary judgment was proper.

ignated as such which offers the features and capabilities described in Exhibit A, subsection (j)." Exhibit A, subsection (j), provides as follows:

(j) The TIM 300 Series Terminals shall be capable of performing the following principal functions;
(i) printing and issuing Tickets with respect to all Pools and denominations identified in this Exhibit A, subsection (a) above;

## LIQUIDATED DAMAGES

■ Having affirmed the district court's ruling that Fair Grounds was in breach of contract, we must next examine the award of liquidated damages. The parties entered a stipulation for $2,159,575 in liquidated damages. This amount was calculated using a method outlined in the agreement itself. Paragraph 13.2 of the agreement reads in relevant parts:

All regular service charges and other charges provided elsewhere herein, shall be payable, without deduction, at the conclusion of each Calendar Week's operation. If such charges are not paid ... they will begin accruing interest ... and AmTote may ... terminate this Agreement.... **Irrespective of any such termination** of this Agreement by AmTote and/or removal of its equipment, the Association [Fair Grounds] shall pay to AmTote as liquidated damages for breach of this Agreement for each operating Year or portion thereof remaining in the term of this Agreement at the date of such termination, an amount equal to the total service fees paid by the Association to AmTote during the twelve (12) months preceding such termination discounted by the prime interest rate at Chase Manhattan Bank.... The total amount of said liquidated damages shall be paid to AmTote promptly upon demand.

(Emphasis added). Stated differently, if Fair Grounds prematurely terminates the agreement, it is required to pay AmTote an amount equal to the service fees paid by Fair Grounds in the previous year, multiplied by the term of years remaining under the agreement, discounted to present value. The parties have stipulated that amount to be $2,159,575.

(ii) reading, transmitting to, and receiving from the Central Totalisator information for cashing Winning Tickets;
(iii) accommodating up to four (4) Wagers on a single Ticket; or any combination of the Pools referred to in this Exhibit A, subsection (a) above, other than a Daily Double Wager;
(iv) providing status indicators as to the current operating mode of the Terminal; and
(v) providing certain special report information.

Fair Grounds now contends that the term "irrespective" in the damages provision means "notwithstanding" and limits AmTote to terminating the agreement and recovering its equipment as its remedy. Fair Grounds' analysis is not persuasive. The clear and plain language of the agreement provides AmTote with the same liquidated damages remedy for any breach by Fair Grounds which terminates the agreement. Under paragraph 13, "[i]rrespective of any such termination of this agreement by AmTote," Fair Grounds must pay liquidated damages for its breach of the agreement.

Fair Grounds next argues that the liquidated damages as calculated are disproportionately large and punitive in nature. As such, the provision is unenforceable because it is "so manifestly unreasonable as to be contrary to public policy." LA.CIV.CODE ANN. art. 2012 (West 1987). However, the Louisiana courts have a tradition of deferring to the parties' stipulations on damages where the contract is freely negotiated, regardless of whether they approximate actual damages suffered. Citing Louisiana law, this Court held in *Pembroke v. Gulf Oil Corp.* that:

> It is well settled under Louisiana law that parties to a contract generally have the unqualified right to stipulate for any amount of liquidated damages in the event of a breach. When the parties thus agree, Louisiana courts refuse to inquire into whether the actual damages suffered equalled or approximated the stipulated amount. It is said that Louisiana courts will not consider the amount of actual damages in order to get a party out of a bad bargain in the absence of fraud, error, or mistake, as long as the stipulations are not contrary to good morals, public policy, or violative of some statutory provision.

454 F.2d 606, 611 (5th Cir.1971) (citations omitted).[7] Thus, we are not prepared to scrutinize the award here.

The liquidated damage award attempts to compensate AmTote for the years remaining on the contract based on a figure representative of its past performance during the 12 months prior to breach. The agreement even provided for discounting. The amount appears to be reasonable, and because the parties are of equal bargaining power, Fair Grounds cannot now ask this Court to relieve it from a bad bargain.

## RULE 60(b) MOTION

The last point for us to consider is whether the district court abused its discretion when it denied Fair Grounds' Rule 60(b) motion for relief from judgment. FED.R.CIV.P. 60(b). Fair Grounds filed this motion several months after the district judge entered a final judgment. An affidavit was submitted by Joseph Gomes attesting that the term "TIM 300 Series Terminals" is regarded within the totalisator industry as referring to a family or series of terminals. Mr. Gomes further asserted that at least one model— other than the TIM 300 model actually installed—could accommodate intertrack wagering on four simultaneous events. Fair Grounds claims that relief is proper because this "new evidence" creates a material fact issue that is central to the litigation and renders the initial judgment unjust.[8]

The district court enjoys a great deal of discretion in determining whether a moving party has established "excusable neglect" under Rule 60(b)(1), and we must review it under a clearly erroneous standard. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 173 (5th Cir.1990). Mr. Gomes was retained by Fair Grounds as an expert and was deposed prior to the motion for summary judgment. We are not prepared to find reversible error because Fair Grounds failed to inquire into the basic components of the TIM 300 Series Terminals at earlier stages of the litigation. Relief under Rule 60(b)(1) and Rule 60(b)(2) was properly denied.

We also believe that relief was not appropriate under Rule 60(b)(6). Relief under this section is granted "only if extraordinary circumstances are present." *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 851 (5th

---

7. The comments to article 2012 indicate that the recodification, effective January 1, 1985, did not change the law regarding liquidated damages.

8. Fair Grounds seeks relief from judgment based on Rule 60(b)(1) for "excusable neglect," Rule 60(b)(2) for newly discovered evidence, and Rule 60(b)(6) for any other reason justifying relief. FED.R.CIV.P. 60(b).

Cir.1990) (quoting *Bailey v. Ryan Stevedoring Co.,* 894 F.2d 157, 160 (5th Cir.1990)). The district court's decision to grant summary judgment did not turn on the meaning or capabilities of TIM 300 Series Terminals. Had the court found the contract to be ambiguous, this information would have been useful as extrinsic evidence. However, the court found the contract language to be clear and unambiguous and it did not impose a minimum number of races that the intertrack wagering system had to accommodate simultaneously. Because Mr. Gomes' affidavit is not so central as to render the initial judgment manifestly unjust, the district court did not abuse its discretion in declining to grant Fair Grounds' motion under Rule 60(b). *See Lavespere,* 910 F.2d at 173.

## CONCLUSION

Accordingly, we AFFIRM the orders and judgment entered by the district court.