**DYSON, INC.**

v.

**ORECK CORPORATION, et al.**

Civil Action No. 07–9633.

United States District Court,
E.D. Louisiana.

Aug. 14, 2009.

Order Denying Reconsideration
Sept. 2, 2009.

David Patron, Sarah Renee Miller, Phelps Dunbar, LLP, New Orleans, LA, Anthony James Lewis, Sullivan & Cromwell, LLP, Los Angeles, CA, David K. Callahan, Rachel M. McLaughlin, Regan A. Smith, Ross M. Weisman, Thomas M. Monagan, Kirkland & Ellis, LLP, Chicago, IL, for Dyson, Inc.

Stephen G. Bullock, Matthew S. Almon, Stone, Pigman, Walther, Wittmann, LLC, New Orleans, LA, David L. Aronoff, Gayle I. Jenkins, Saul S. Rostamian, Winston & Strawn, LLP, Los Angeles, CA, for Oreck Corporation, et al.

## *ORDER*

SARAH S. VANCE, District Judge.

Before the Court is Dyson, Inc.'s Motion for Summary Judgment. Dyson's motion is granted in part and denied in part for the following reasons.

## I.  Background

### A.  Procedural Background

This case is the third action in the past four years between Oreck and Dyson. In the first action, *Oreck Holdings, LLC v. Dyson, Inc.*, No. 05–361, Oreck alleged that Dyson's "no loss of suction" advertisement was false advertising under the Lanham Act. Dyson brought a number of false advertising counterclaims against Oreck, (05–361, R. Doc. 15), and the parties filed cross-motions for summary judgment. Before the motions were heard, the parties settled, and the Court dismissed the action

with prejudice on January 10, 2007. (05–361, R. Doc. 148).

Pertinent to this motion, the parties entered into a settlement agreement containing the following provision governing future advertising:

1. *Future Advertising*

a. The parties shall be free to use, at their election, the advertising claims that are being made by either party as of the Effective Date for the products existing in the United States marketplace as of the Effective Date, without incurring any further liability to each other. This provision shall also apply to, and allow such advertising by, (i) distributors, (ii) retailers and (iii) affiliates.

b. For a period of one year after the Effective Date, neither Dyson nor Oreck, in any visual element of its advertisements, shall use or feature the vacuums of the other in connection with any claim that either product is unsanitary, dirty, unhealthy, or the like.

(Dyson's Ex. 1.) Four months after the settlement, Oreck sued Dyson for false advertising with regard to its newest model, the DC18. (07–2744, Complaint, R. Doc. 1). Oreck again claimed that Dyson's "no loss of suction" claim was false advertising, and the Court issued summary judgment on *res judicata* grounds. (07–2744, R. Doc. 42).

Dyson filed the present suit against Oreck Corporation; Oreck Direct, LLC; Oreck Merchandising, LLC; Oreck Sales, LLC; Oreck HomeCare LLC; and Oreck@Home, LLC (collectively known as "Oreck") on December 18, 2007. Dyson claims that Oreck's new advertising campaign directly attacking Dyson violates the Lanham Act, the Louisiana Unfair Trade Practices Act and the terms of the settlement agreement. Dyson now moves for summary judgment that certain infomercials, in-store displays, demonstrations, and newspaper advertisements violate the settlement agreement's prohibition against the "use or feature" of a Dyson vacuum "in any visual element of [Oreck's] advertisements ... in connection with any claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like."

**B. The XL 21 Infomercials**

Dyson first argues that two infomercials promoting the Oreck XL 21 violate the terms of the settlement. The Court briefly describes the alleged violations here. About two-minutes in to Oreck's 28 minute "long-form" infomercial, Oreck displays a Dyson next to two other bagless vacuums. (Dyson's Ex. 10, UPR1–Clip 1.) A voice-over states that "when it comes to vacuums, bagless is a dirty word. Bagless vacuums ... can spew dust and germs into the air you breathe." As the announcer makes this statement, a large red letter X flashes over the line-up of vacuums. (*Id.*) The voice-over then announces that "A leading consumer magazine warns to wear a dust mask when emptying a bagless vacuum." (*Id.*) This statement is accompanied by a graphic that displays the magazine's warning in the style of a newspaper or magazine headline. (*Id.*) The infomercial does not identify the Dyson by name, but Oreck's Director of Marketing testified in her deposition that one of the bagless vacuums portrayed is a Dyson. (Dyson's Ex. 9, 78:16–19.)

A 120–second version of the advertisement shows the same line-up of bagless vacuums and states that "Many vacuums can spew dust and germs into the air you breathe." (Dyson's Ex. 10, XUPR–XL21.)

**C. Oreck's "Dare to Compare" Campaign**

Dyson also argues that Oreck breached the settlement agreement with its "Dare to

Compare" advertising campaign, launched in the Fall of 2007. As the name suggests, the campaign invites customers to compare the Oreck vacuum with its bagless competitors, including the Dyson. This campaign involved several elements, including an infomercial, in-store demonstrations and display materials, and newspaper advertisements. Dyson argues that each aspect of the campaign breached the parties' agreement.

### i. "Dare to Compare Infomercial"

Oreck produced a 28 minute infomercial in connection with the "Dare to Compare" campaign. (Dyson's Ex. 10, Vac–1 Dare to Compare.) Dyson's motion describes several alleged breaches of the settlement agreement, which are briefly summarized here:

1. The infomercial's host, Terrie Ouelette, empties a Dyson DC 14 and exclaims: "Look at that, I'm dirty. And not only that, my countertops are dusty, the floor I just vacuumed is dirty again, and now I have to touch it to close it . . . I don't think this is sanitary at all. Oh, and look at it, I'm a mess."

2. Ouelette and co-host David Oreck have the following exchange:

*Ouelette:* "I can really see how a bagless vacuum cleaners will spread dirt and dust all over my house and me."

*David:* "That's because simply by emptying this bagless dirt cup you not only can be spreading dust and nasty particles into the air, you can also get that mess all over you. . . . Not very clean or sanitary. And their dirty little secret is out."

3. The infomercial's announcer makes the following statements:

a. "Are you . . . disgusted with the unsanitary mess that comes with emptying the dust cup of bagless vacuums?";

b. The Oreck XL Ultra is "more sanitary" and the "cleaner . . . way to vacuum your home."

4. The infomercial depicts consumers holding a Dyson dustbin over a trashcan and saying, "what a mess; I don't like dealing with that dust; dust city; that's gross."

### ii. The "Dare to Compare Toolkit"

As part of the campaign, Oreck provided its franchisees with an advertising "toolkit." (Dyson's Ex. 17 at Oreck 06571.) The toolkit provides sample radio and newspaper advertisements inviting consumers to compare the Oreck and Dyson. One newspaper ad shows the Oreck XL Ultra and the Dyson DC 14 next to each other with the caption:

> Dyson and Oreck are now going head to head only at your Oreck Clean Home Center. No Guess work involved. You can see who beats who in advanced technology. Which is heavy. And which is light. . . . Which one is more sanitary. And which one is so advanced it helps inhibit bacteria in and on the vacuum.

(*Id.* at 06592.)

The toolkit also contains instructions for in-store demonstrations. The instructions invite franchisees to buy a Dyson DC14 at Oreck's expense and display it alongside Oreck upright vacuums in their stores. (*Id.* at Oreck 06572.) When a customer enters a franchisee's store, the toolkit instructs the franchisee to "invite them to compare the Dyson to the Oreck XL Ultra. Ask them to compare the two vacuums for . . . cleanliness." (*Id.*)

To help franchisees "present and execute the Dyson Challenge consistently and effectively," Oreck provided franchisees with an eight-point script and training guide. (Dyson's Ex. 18 at Oreck 08761–64.) The materials state that they "should

be used as a training guide for your associates to go through the script and get comfortable with presenting the 8–steps of the Dyson challenge." (*Id.* at 08761). In connection with the heading "Step 4: Compare Dirt Disposal," the script states: "Using a dust cup never made much sense to me. Every time you empty it you can spew the dust back into the room you just cleaned. Its pretty disgusting! Plus that dust cup can really get nasty smelling after a month or two." (*Id.* at 08763.)

The toolkit further directs franchisees to display certain informational sheets "in an 8.5 × 11 plexi sign near your store's demo area." (*Id.* at 08761.) One of the informational sheets depicts a Dyson DC14 with the caption "Dirty/Difficult to Empty." (*Id.* at 08767.)

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *see also Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See id.* at 325, 106 S.Ct. 2548; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

### B. Contract Interpretation

In *Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.,* the Fifth Circuit recently stated the principles governing settlement agreement interpretation under Louisiana law.

A settlement agreement is a contract. The rules of construction applicable to contracts are therefore used. *Trahan v. Coca Cola Bottling Co. United, Inc.,* 894 So.2d 1096, 1106 (La.2005); *see also La. Civ.Code Ann. art.* 3071. The ambiguity of a contract is a legal question. *Sims v. Mulhearn Funeral Home, Inc.,* 956 So.2d 583, 590 (La.2007). If the answer to the legal question of ambiguity is in the negative, then interpreting that unambiguous contract is also a legal issue for the court. *Tex. E. Transmission Corp. v. Amerada Hess Corp.,* 145 F.3d 737, 741 (5th Cir.1998).

Louisiana had adopted several statutory rules for interpretation of contracts. We find some relevant guidance in each of the following sections of the Louisiana Civil Code:

Art. 2045. Determination of the intent of the parties: Interpretation of a contract

is the determination of the common intent of the parties.

Art. 2047. Meaning of words: The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter.

Art. 2048. Words susceptible of different meanings: Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract.

Art. 2049. Provision susceptible of different meanings: A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective.

Art. 2050. Provisions interpreted in light of each other: Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

570 F.3d 219, 225 (5th Cir.2009).

## III. Analysis

Oreck advances a barrage of arguments that the phrases "use or feature," "in connection with" and "unsanitary, dirty, unhealthy, or like" in the settlement agreement are ambiguous as applied to the advertisements. The Court addresses two of Oreck's more general arguments before analyzing each ad.

First, the Court rejects Oreck's argument that the phrase "in connection with" is ambiguous. Oreck attempts to create ambiguity by focusing on the definition of "connection," which it defines as "a causal or logical relation or sequence; contextual relation or association; or relationship in fact." (Oreck's Mem. in Opp. at 8)(*citing* Merriam–Webster's Dictionary). Relying on this definition, Oreck argues that "[o]ne interpretation of the phase would mean that merely some association between the use or feature of the Dyson products and the ad claim would violate the Settlement Agreement, while another reasonable interpretation would require a causal sequence between the 'use or feature' of the Dyson product and the ad claim." (*Id.*)

Oreck incorrectly relies on the definition of "connection" alone, when the phrase "in connection with" is itself defined. The phrase "in connection with," as a whole, is defined as "together with; in conjunction with." *Webster's New World College Dictionary* 309 (4th Ed.1999). This definition resolves Oreck's proposed ambiguity. Neither "together with" or "in conjunction with" supports the "casual sequence" interpretation advanced by Oreck. Indeed, Oreck makes no effort to explain how a claim that a Dyson is "unsanitary, dirty, unhealthy, or like" can have a causal connection to the product's use or feature.[1] By contrast, substituting the word "association" for "connection" is consistent with how the phrase "in connection with," as a whole, is defined, and preserves the sentence's plain meaning, *i.e.*, that Oreck cannot refer to the Dyson as "unsanitary, dirty, unhealthy, or like" when the ad uses or features the product.

The Court also does not find the phrase "or the like" ambiguous here. The Oxford English Dictionary defines the phrase "or the like" as "a formula used to avoid further enumeration of an indicated class." Similarly, "the like" is defined as "something or anything similar; the same kind of thing." In the settlement agreement,

---

1. Oreck also selectively relies on half of its preferred definition. The definition Oreck relies on refers to a causal or *logical* connection, and the Court does not see any difference between an association and a logical connection in this context.

the phrase indicates that the terms "unsanitary, dirty, unhealthy" are illustrative. It shows that the agreement prohibits the use of these terms and terms similar in meaning to each of the listed adjectives. Webster's New World College Dictionary (4th Ed.1999) defines unsanitary, unhealthy, and dirty, respectively, as: "not sanitary; unhealthful or likely to cause disease"; "harmful to health; unwholesome"; and "soiled or soiling with dirt; unclean; causing one to be soiled in dirt; lacking luster or brilliance; dull, grayish, etc." In relation to these terms, "or the like" easily encompasses the adjectives and descriptive phases that Oreck argues do not implicate the settlement agreement, including that the Dyson "spreads" or "spews" dust, dirt, germs, *etc.;* is "messy," "not very clean or sanitary," and "disgusting."

■ The phrase does have its limits. The phase "unsanitary, unhealthy, dirty, or the like" cannot reasonably be stretched to reach the claim made in Oreck's newspaper ad inviting customers to "Come in and Compare .... [w]hich [vacuum] is more sanitary .... [a]nd which one has technology so advanced it helps inhibit bacteria in and on the vacuum." (Dyson's Ex. 17 at 06592.) The ad implies that the Oreck is the "more sanitary" of the two, but it does not follow that the Dyson is unsanitary. Rather, the ad simply touts a particular feature of the XL Ultra that Dysons lack. Oreck claims that this feature makes the XL Ultra "more sanitary" than the Dyson, but the ad does not claim that the Dyson is "unsanitary, unhealthy, dirty, or the like." The Court therefore dismisses Dyson's claim based on this particular ad at this time.

With these principles in mind, the Court will consider each advertisement at issue.

*i. XL 21 Commercials*

Both the short and long-form XL 21 commercials feature a Dyson in connection with a claim that the vacuum is dirty. In both commercials, a Dyson is pictured next to two other bagless vacuums while the announcer states that bagless vacuums "can spew dust and dirt into the air you breathe." This statement is encompassed within the phrase "unsanitary, unhealthy, dirty, or the like." Specifically, "dirty" is defined as "causing one to be soiled in dirt," which is the presumed consequence of "spewing" dirt into the air.

Oreck argues that these commercials do not "feature" the Dyson because the Dyson is depicted only briefly. Oreck defines "feature" to mean "give special prominence," (Oreck's Mem. in Opp. at 7.), while Dyson apparently argues that any depiction of a Dyson vacuum in an ad counts as "featuring" the product. The difference between these two definitions in the context of the settlement agreement is marginal. The agreement forbids Oreck from "featur[ing] the [Dyson] in connection with any claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like." The inquiry, then, is whether the Dyson is "featured" in relation to a particular claim, not the advertisement as a whole.

■ Oreck argues that the long-form commercial does not feature the Dyson because it displays the Dyson for only 22 seconds of a 28 minute infomercial. Likewise, Oreck states that the Dyson is present for only one-second of the 120–second short commercial. The Dyson is, however, given prominence in connection with Oreck's claim that bagless vacuums spew dirt. It is one of three bagless vacuums displayed while this claim is spoken, and the Court finds that this features the Dyson in connection with this claim.

Oreck makes an additional argument that is unique to the XL–21 commercials. Oreck argues that both the long and short

form XL–21 commercials are "grandfathered" under section 1(a) of the settlement agreement because they were created before the agreement's Effective Date.

Section 1 of the settlement agreement addresses "Future Advertising." Subsection (a) of that provision states:

> The parties shall be free to use, at their election, the advertising claims that are being made by either party as of the Effective Date for the products existing in the United States marketplace as of the Effective Date, without incurring any further liability to each other.

(Dyson's Ex. 1.) The key word in this clause is "claims." The provision allows Oreck to continue making certain claims about Dyson's products that existed on the Effective Date, as long as Oreck used that claim before the Effective Date. Oreck argues that the XL–21 commercials, which were produced and originally aired before the Effective Date, qualify.

Dyson disagrees because the XL 21 ads visually depict a Dyson. Dyson bases this argument on the language of section 1(b), which states:

> For a period of one year after the Effective Date, neither Dyson nor Oreck, in any visual element of its advertisements, shall use or feature the vacuums of the other in connection with any claim that either product is unsanitary, dirty, unhealthy, or the like.

(*Id.*) Dyson argues that section 1(b) is a one-year, flat ban on advertisements that use or feature a Dyson in a "visual element" in connection with "a claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like," regardless of whether the commercial was created before the Effective Date.

Both sides have submitted evidence of the parties' intent in drafting these two clauses. When the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties' intent within the four corners of the document. La. Civ.Code arts. 1848, 2046. *See also American Totalisator Co. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir. 1993). Because the Court finds that the settlement agreement is clear, the Court declines to address this evidence.

■ Sections 1(a) and 1(b) "must be interpreted in light of [each] other," La. Civ.Code. Art.2050, and the Court must give each clause "a meaning that renders it effective." *Id.* at art. 2049. Section 1(a) permits Dyson to make certain advertising "claims" about some Dyson products, while section 1(b) prohibits the use or feature of the product in a a "visual element" in connection with a "claim." Read together, the term "claim" in these two provisions refers to a given statement, such as "bagless vacuums are dirty." Visual elements are identified and treated separately. Section 1(a) allows claims but does not address visual representations. Similarly, 1(b) prohibits visual representations used or featured in connection with certain claims but does not make the claims alone actionable. The settlement agreement allows Oreck to make the claim that certain Dyson products are dirty, assuming Oreck also made this claim before the Effective Date. The agreement does not permit Oreck to use or feature a Dyson in a "visual element" in connection with the claim. The XL 21 commercials fall into the latter category and are not subject to section 1(a)'s "grandfather" provision.

*ii. "Dare to Compare" Infomercial*

The "Dare to Compare" infomercial contains several unambiguous breaches of the settlement agreement. About five minutes into the commercial, the host empties the Dyson's dustbin into the trash and ex-

claims "I'm dirty ... the floor I just vacuumed is dirty again.... I don't think this is sanitary at all." This statement implicates the definition of dirty as "causing one to be soiled in dirt" and. also calls the vacuum unsanitary. The parties dispute whether the host "uses" the Dyson in this segment.

■ Dyson argues that "use" means to depict or display the vacuum, while Oreck contends that the settlement agreement is only violated when the vacuum is being operated. Merriam–Webster's definition supports both usages. Merriam–Webster's defines "use" as "to put into action; avail oneself of: Employ."[2] In an advertisement, Oreck avails itself of the Dyson vacuum by displaying the product and contrasting it with their own or making disparaging comments about the product. Oreck's definition—that use requires that the machine be put into action—is equally plausible. The Court rejects, however, Oreck's argument that the host does not use the Dyson unless she actually vacuums with it. (*See* Dyson's Mem. in Opp. at 7)("the conduct that Dyson complains of does not involve *any* vacuuming with a Dyson unit."). The ad shows the host emptying the Dyson's dust bin, which involves "put[ting] into action" or "availing oneself of" the Dyson as much as vacuuming does. The Court therefore finds that the segment described violates the agreement even under Oreck's narrower definition.

The infomercial contains several other clear breaches. Roughly ten-minutes later, the commercial's host states "I can really see how a bagless vacuum cleaner will spread dirt and dust all over my house and me .... you can also get that mess all over you." Both statements describe the Dyson as "causing one to be soiled in dirt." The host then states that the Dyson is unsanitary and dirty—as in "unclean"—when she says "not very clean or sanitary." The host features the Dyson during these statements by holding the Dyson's dustbin.

The commercial also features several testimonials in which either David Oreck or a customer empties (uses) the Dyson as customers exclaim "thats gross" and "what a mess." Both of these statements imply that the Dyson is "unclean" and "caus[es] one to be soiled in dirt."

### iii. In-store Materials

Dyson also argues that the in-store materials Oreck provided to its franchisees violate the settlement agreement. It is unclear from Dyson's briefs under what circumstances the in-store materials violate the settlement agreement. At oral argument, Dyson articulated two theories. Dyson's more straightforward argument claims that Oreck violates the settlement agreement when a franchisee, as Oreck's agent, displays the training materials or puts them to use by conducting an in-store demonstration. Dyson also argues that Oreck violates the settlement agreement when it gives its franchisees the materials and instructs them that they can advertise using those materials only.

■ The Court finds Dyson's first argument persuasive. "An agent is one who acts for or in place of another by authority from the latter." *Cross v. Cutter Biological Div. of Miles Inc.*, 676 So.2d 131, 147 (La.Ct.App.1996). An agency relationship can be created expressly or can be implied

---

**2.** "Use" is also defined as "to consume or take (as liquor or drugs) regularly; to expend or consume by putting to use; to behave toward: act with regard to: treat; to carry out a purpose or action by means of: utilize or stand." The Court does not find these definitions applicable, however, and Dyson does not argue that they are.

by apparent authority. *Id.* The test for implied agency is "whether the principal has the right to control the conduct of the agent and whether the agent has the right and authority to represent or bind the principal." *Id.* Courts examine "the words and conduct of the parties and the circumstances of the case" to determine whether an agency relationship exists. *Id.*

■ Here, Oreck's franchisees act as Oreck's agents when they run advertisements. The franchisees have no input or discretion with respect to advertising content. A November 2007 memo to franchisees states "ONLY marketing materials that were created and approved by Oreck Home Office marketing can be used for any aspect of the Come in and Compare campaign.... No one is permitted to use any 'home grown' creative or change any aspect of centrally created materials for this campaign." (Dyson's Ex. 23 at ORECK05369.) One Oreck franchisee confirmed this arrangement, testifying in her deposition that franchisees can "only use the ads that [Oreck] provide[s] or get approval for something other than what they provide." (Dyson's Ex. 22 at 32:22–23.) Although franchisees retain discretion whether to run a particular ad campaign, they are limited to advertisements provided by Oreck if they advertise at all. (Oreck's Ex. C at 104:23–105:13)("So materials that are made available to us and things that [Oreck] tells us, you know, possible scenarios or training or so on and so forth are still the option of the independent owner whether they implement them or not."). The Court therefore finds that ads run by franchisees in compliance with Oreck's advertising instructions can be attributed to Oreck for purposes of the settlement agreement.

■ Dyson has demonstrated only one violation under this theory, however. Lori Miller, a California franchisee, stated in

her deposition that "for the purpose of [Dare to Compare], if we talked to customers when they saw the Dyson vacuum and if we were talking about bag disposal or dirt disposal, then, yes, it would be, you know, 'yeah, this is probably dirtier than having a bag.'" (Dyson's Ex. 22 at 112:1–5.) Oreck directs franchisees to conduct similar demonstration in its eight-point script and other training materials. (*See* Dyson Ex. 18.) The comparative adjective "dirtier" is a straight-forward violation of the agreement's terms. Moreover, Miller's statements indicate that she featured the Dyson in connection with this claim when she says "this [*i.e.* the Dyson] is probably dirtier than having a bag." (Dyson's Ex. 22 at 112:1–5.) Since the presence of an actual Dyson vacuum satisfies the "visual element" requirement of the agreement, the Court holds that Miller's statements describe an advertisement violating the settlement agreement.

■ Dyson also argues that a franchisee displayed an information sheet comparing an Oreck and Dyson in violation of the settlement agreement, but Dyson has not proved that the franchisee's actions violated the agreement. Dyson produced a letter from its counsel to Oreck's stating "Oreck is apparently using display advertising in its retail stores that purports to compare the Dyson DC14 model vacuum cleaner to a new Oreck XL Ultra model." (Dyson's Ex. 22.) Attached to the letter is a chart that depicts a Dyson with the caption "dirty." (*Id.*) Oreck's "Dare to Compare" training materials suggest that franchisees frame the sheet with plexi glass and display it in the store's demonstration area, (*id.* at 08761), but no evidence demonstrates that this instruction was followed here. Oreck argues that the chart is for training purposes only, and the Court is not prepared to hold that any display of the chart in an Oreck franchise

store, regardless of location, is an advertisement that violates the settlement agreement. Since there is an issue of fact as to how and where the chart was displayed, the Court cannot find a breach based on the evidence provided.

The Court next rejects Dyson's argument that Oreck violates the settlement agreement when it gives its franchisees the materials and instructs them that they can advertise using those materials alone. Dyson faces only a potential injury when Oreck provides its franchisees with these materials. The evidence indicates that franchisees are not required to run a certain ad campaign or a particular aspect of that campaign. (Oreck's Ex. C at 104:23–105:13)("So materials that are made available to us and things that [Oreck] tells us, you know, possible scenarios or training or so on and so forth are still the option of the independent owner whether they implement them or not."). If a given franchisee chooses to opt out, Dyson is not harmed. As there is no guarantee that the materials Oreck sends to a franchisee will be used in a manner prohibited by the agreement, the Court cannot accept Dyson's argument that just providing materials to franchisees is a violation. Dyson must point to actual conduct by the franchisees to demonstrate a breach of the parties' agreement and Dyson has shown only one such violation in connection with its motion.

## IV. Conclusion

Dyson's Motion for Summary Judgment is GRANTED in part and DENIED in part for the reasons stated.

### ORDER AND REASONS

Before the Court is the Oreck Defendants' Motion for Clarification, or in the Alternative, Reconsideration of Order on Dyson's Motion for Partial Summary Judgment. Oreck's motion is denied for the following reasons.

## I. Relevant Procedural Background

This case is the third action in the past four years between Oreck and Dyson. In the first action, *Oreck Holdings, LLC v. Dyson, Inc.*, No. 05–361, Oreck alleged that Dyson's "no loss of suction" advertisement was false advertising under the Lanham Act. Dyson brought a number of false advertising counterclaims against Oreck, (05–361, R. Doc. 15), and the parties filed cross-motions for summary judgment. Before the motions were heard, the parties settled, and the Court dismissed the action with prejudice on January 10, 2007. (05–361, R. Doc. 148.)

Pertinent to this motion, the parties entered into a settlement agreement containing the following provision governing future advertising:

1. *Future Advertising*

a. The parties shall be free to use, at their election, the advertising claims that are being made by either party as of the Effective Date for the products existing in the United States marketplace as of the Effective Date, without incurring any further liability to each other. This provision shall also apply to, and allow such advertising by, (i) distributors, (ii) retailers and (iii) affiliates.

(b) For a period of one year after the Effective Date, neither Dyson nor Oreck, in any visual element of its advertisements, shall use or feature the vacuums of the other in connection with any claim that either product is unsanitary, dirty, unhealthy, or the like.

(Dyson's Ex. 1.) Four months after the settlement, Oreck sued Dyson for false advertising with regard to its newest mod-

el, the DC18. (07–2744, Complaint, R. Doc. 1.) Oreck again claimed that Dyson's "no loss of suction" claim was false advertising, and the Court issued summary judgment on *res judicata* grounds. (07–2744, R. Doc. 42.)

Dyson filed the present suit against Oreck Corporation; Oreck Direct, LLC; Oreck Merchandising, LLC; Oreck Sales, LLC; Oreck HomeCare LLC; and Oreck@Home, LLC (collectively known as "Oreck") on December 18, 2007. The complaint alleges that Oreck's new advertising campaign directly attacking Dyson violates the Lanham Act, the Louisiana Unfair Trade Practices Act and the terms of the settlement agreement.[1] On May 12, 2009, Dyson moved for partial summary judgment. One of Dyson's arguments was that Oreck's long-form XL 21 commercial violated the settlement agreement's prohibition against the "use or feature" of a Dyson vacuum "in any visual element of [Oreck's] advertisements . . . in connection with any claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like."[2] (*See* R. Doc. 111–2 at 5–9.) Dyson focused on a particular 15–second spot depicting a Dyson and asserting, among other things, that bagless vacuums "spew dust and germs into the air you breathe." (UPR1–Clip, R. Doc. 111–4, Ex. 10.)

In response, Oreck argued that the long-form XL 21 commercial "did not 'use or feature' a Dyson in a potentially offending way." (R. Doc. 127–1 at 11). Oreck focused on the arguably brief amount of time that the Dyson was shown in the commercial. Oreck also argued that its claim about bagless vacuums spewing dust and germs into the air was "directed at the

entire field of bagless vacuums, not the Dyson specifically." (*Id.*) Oreck did not state in its response whether a dust cup depicted toward the end of the spot was part of a Dyson or some other bagless vacuum.

The Court issued an order on August 14, 2009 granting in part and denying in part Dyson's motion for partial summary judgment. (*See* R. Doc. 189.) The Court held that no reasonable juror could find that the spot does not "feature a Dyson in connection with a claim that the vacuum is dirty." (R. Doc. 189 at 13–14.) The Court accordingly held that the long-form XL 21 commercial violated section 1(b) of the settlement agreement and granted Dyson's motion for summary judgment as it pertained to Oreck's long-form XL 21 commercial. (*Id.*) Oreck now seeks clarification or, in the alternative, reconsideration of only this aspect of the August 14 Order.

## II. Legal Standard

Federal Rule of Civil Procedure 54(b) provides that an order that adjudicates fewer than all the claims among all the parties "may be revised at any time" before the entry of a final judgment. Fed. R.Civ.P. 54(b). As Rule 54 recognizes, a district court "possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir. 1981). Although the district court's discretion in this regard is broad, *see Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1414–15 (5th Cir.1993); *Lavespere v. Niagara Mach. & Tool Works, Inc.*,

---

**1.** The Court observes that Dyson has recently conceded that it is not bringing Lanham Act and Louisiana Unfair Trade Practices Act claims based on the XL 21 commercials. (*See* R. Doc. 228–1 at 2.)

**2.** This is the only relevant aspect of Dyson's motion for partial summary judgment because Oreck seeks only clarification or, in the alternative, reconsideration with respect to the Court's resolution of this claim.

910 F.2d 167, 185 (5th Cir.1990), *abrogated on other grounds, Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994) (en banc), it is exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See generally* 18b Charles A. Wright et al., Fed. Prac. & Proc. Juris. § 4478.1 (2d ed.2002).

The general practice of this court has been to evaluate motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment.[3] Although there may be circumstances in which a different standard would be appropriate, *see, e.g., Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–16 (4th Cir.2003), the present motion does not present them. The proper inquiry is therefore whether the moving party has "clearly establish[ed] either a manifest error of law or fact or ... present[ed] newly discovered evidence." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir.2005) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir.1990)). A motion to reconsider is "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of [the order]." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir.2004).

### III. Analysis

Oreck does not offer any new evidence in support of its motion. Oreck instead argues that the Court made an error of fact in describing the spot and that this error warrants revisiting the August 14 Order.

Oreck asserts that "[a]s a matter of fact, the Dyson is *not* displayed visually when the statement regarding the spewing of dust is made in the XL21 long-form infomercial." (R. Doc. 215–3 at 3.) Oreck's point appears to be that at the precise moment when the "offensive statement is made" (*i.e.*, the statement that bagless vacuums can spew "dust and germs into the air you breathe"), "the dust cup shown pertains to another manufacturer's vacuum, likely a Hoover or Bissell, but in any event *not* a Dyson." (*Id.* at 3–4.)

Even if Oreck's frame-by-frame characterization of the spot were factually accurate,[4] this would not change the Court's decision. The spot prominently depicts a Dyson in a three vacuum line-up and in actual operation immediately before the depiction of a dust cup spewing dust into the air. No visual cue alerts the viewer that the clear plastic dust cup is not part of the Dyson that appears moments before (and Oreck has not provided any evidence that it is not in fact). The unbroken narration of the voice-over also logically connects the visual depiction of the Dyson (in operation under a coffee table) to the dust cup (now full of dust) spewing "dust and germs into the air you breathe." (*See* UPR1–Clip, R. Doc. 111–4, Ex. 10.) That the particular dust cup in the spot may or may not be a Dyson dust cup is beside the point. In the mind of any reasonable viewer, the spot features a Dyson in connection with a claim that it is unsanitary, dirty and unhealthy.[5]

---

**3.** *See, e.g., Lacoste v. Pilgrim Int'l*, No. 07–2904, 2009 WL 1565940, at *8 (E.D.La. June 3, 2009) (Vance, J.); *Rosemond v. AIG Ins.*, No. 08–1145, 2009 WL 1211020, at *2 (E.D.La. May 4, 2009) (Barbier, J.); *In re Katrina Canal Breaches Consol. Litig.*, No. 05–4182, 2009 WL 1046016, at *1 (E.D.La. Apr. 16, 2009) (Duval, J.).

**4.** Oreck has not submitted any evidence or an affidavit supporting its assertion that the dust cup is not part of a Dyson vacuum.

**5.** Oreck itself suggests that the word "connection" should be considered as a "logical relation or sequence; contextual relation or association." (R. Doc. 127–1 at 8.) No reasonable

The Court finally notes that its holding today is consistent with its order of March 4, 2009. In the March 4 Order, the Court observed that an Oreck commercial depicting a *Hoover* vacuum and implying that all bagless vacuums were similarly messy did not violate the parties' settlement agreement. (R. Doc. 89 at 12) Here, the spot prominently features a *Dyson* in both the three vacuum line-up and in the coffee table segments. The spot therefore constitutes a "specific" as opposed to a "generic" attack on Dyson's vacuum. (*Id.*)

In sum, Oreck has failed to demonstrate that this Court's August 14 Order should be altered. Oreck's motion for clarification or reconsideration must be denied.

## IV. Conclusion

Dyson's Motion for Clarification, or in the Alternative, Reconsideration of Order on Dyson's Motion for Partial Summary Judgment is DENIED for the reasons stated.

juror could find that the images of the Dyson in the first and second segments are not logically related to the image of the dust cup spewing "dust and germs" in the third segment.